183 P.3d 324 (2008)
Daniel GEBBERS, People for Alternatives, Conservation & Education; and Methow Valley Citizens' Council, Appellants,
v.
OKANOGAN COUNTY PUBLIC UTILITY DISTRICT NO. 1, and the Commissioners thereof; Donald W. Johnson, Ernest J. Bolz, and David W. Womack, Respondents.
No. 25995-1-III.
Court of Appeals of Washington, Division 3.
May 1, 2008.
*325 Peter Robert Goldman, Attorney at Law, Seattle, WA, for Appellant.
Steven Gary Jones, Michael Gregory Lufkin, Dustin Trowbridge Till, Marten Law Group PLLC, Seattle, WA, Michael D. Howe, Attorney at Law, Omak, WA, for Respondent.
BROWN, J.
¶ 1 Property owner Daniel Gebbers; People for Alternatives, Conservation & Education; and Methow Valley Citizens' Council (collectively Citizens) appeal from a final order of the Okanogan County Superior Court upholding the adequacy of the Final Environmental Impact Statement (FEIS) of the Okanogan County Public Utility District No. 1(PUD). The PUD Board, by split vote, adopted alternative 2 for a new electrical transmission line and substation between Pateros and Twisp, while repairing and maintaining the existing Okanogan to Twisp transmission line, known as the Loup Loup line, for a secondary or redundant power source. We reject the Citizens' contention *326 that the FEIS is legally deficient for failing to consider work on the existing line (Alternative 4) as a connected action under a cumulative impacts analysis. We also reject Citizens' contentions that the FEIS underestimates Alternative 2 environmental impacts and economic costs while exaggerating those for Alternative 4. We conclude the FEIS was adequate under the rule of reason and the PUD did not act arbitrarily and capriciously. Accordingly, we affirm.

FACTS
¶ 2 The PUD electrical system has two main components, transmission and distribution. Existing transmission lines carry high voltage electricity to substations located in the Methow Valley. Distribution lines carry lower voltage to consumers. The transmission line was built in 1948 to serve the Methow Valley by bringing power west from the substation at Okanogan to substations at Malott, the Loup Loup summit area, and Twisp. The existing system has for years experienced reliability, capacity, and line loss problems. Increased service failures are predicted. The existing single radial transmission line has no back-up during power losses.
¶ 3 Capacity refers to the megawatts of power that a transmission line can carry. The existing line's capacity is 45 megawatts (MW). When the line approaches capacity, voltage drops may be so severe that damage results to the PUD's and customer-owned equipment. Capacity problems are expected to increase as the service population grows. Transmission line loss is the loss of power that could have been delivered to customers. The existing line presently experiences excessive and costly line losses. Replacing line conductors with larger wires is one method of reducing line losses. The electrical distribution system is now chronically overloaded, causing outages. Distribution line losses are partly caused by the distance between the substation and the consumer.
¶ 4 As a result, in 1996, the PUD proposed a new transmission line and substation between Pateros and Twisp. Progress slowed when the Superior Court ordered the preparation of an EIS. The PUD as lead agency under the State environmental Policy Act (SEPA), and the U.S. Forest Service as federal lead agency, worked together to prepare a draft EIS. The agencies sought input from citizens, environmental groups, and government agencies. After a lengthy process, the agencies prepared, and the PUD Board adopted, a Purpose and Need Statement to address the reliability, capacity, and line loss problems in both the transmission and distribution components of the PUD's system. Fifteen alternatives were identified and compared against the PUD's stated objectives. At a 2004 public meeting, the Board eliminated alternatives that did not appear to meet project needs. The Board approved six alternatives for consideration, plus a SEPA mandated no-action alternative.
¶ 5 In January 2005, an extensive Draft EIS (DEIS) was released describing each alternative to allow impact assessments. The DEIS included technical appendices addressing air quality, soils and erosion, vegetation, fish and wildlife, and visual aesthetics. The PUD conducted two public hearings and held several public meetings. The PUD responded to over 400 public comment letters and modified the Final Environmental Impact Statement (FEIS) to better explain issues or respond to public concerns.
¶ 6 In February 2006, the PUD manager, as the SEPA lead agency responsible official, selected Alternative 2 as the preferred alternative. The PUD released the FEIS on March 7, 2006. After extensive discussion of potential impacts on resources, the FEIS concluded none of the alternatives would have significant environmental impacts. At a regular public meeting on March 28, 2006, the PUD Board selected Alternative 2 over Alternative 4 by a 2 to 1 vote and directed work to begin. This appeal challenges that selection.
¶ 7 Alternative 2 proposes about 28 miles of new transmission line from Pateros to Twisp with installation of an 85-MW capacity conductor. A new substation will be constructed in the Gold Creek area, dividing the load on the lower valley distribution system in half. About 21.6 miles of new track road must be constructed and 252 structures installed. *327 About five miles of the new line would be overbuilt on the existing lower valley distribution system. The distribution system would not require total rebuilding. The new line would become the main transmission line into the Methow Valley. The FEIS estimates a cost of about $10.7 million for Alternative 2. The estimated system capacity totals 130 MW85 MW for the new line plus 45 MW for the existing line.
¶ 8 Under Alternative 2, the existing Loup Loup transmission line would be repaired and maintained for service as a secondary or backup line and a redundant power source. The existing line is redefined as a secondary or "weak" line in an "Improved Radial Transmission Grid" with looped substation and transmission lines where one side of the loop has normal peak load capacity. The existing line will have lesser performance criteria than a single radial line.
¶ 9 In an improved radial grid, a secondary line must have sufficient capacity to carry 80 percent of the normal cold load on the primary line. The existing 45 MW line can meet this standard until the load increases to 56 MW (56 × 80% = 44.8 MW). According to the PUD's technical consultants, Foster Wheeler Environmental Corporation, the Methow Valley load in the year 2020 is estimated at 39.7 MW. Switches would be installed near Pateros, Gold Creek and Twisp to allow power to be switched from the new line to the existing line as needed.
¶ 10 The FEIS determines that Alternative 2 meets all of the technical objectives established for the Methow Transmission Project. Those objectives are: (1) reducing transmission line voltage drops; (2) ensuring transmission capacity to accommodate anticipated load growth; (3) reducing transmission line-related outages; (4) reducing existing transmission line losses; (5) reducing voltage drops on the distribution circuits; (6) ensuring distribution capacity to accommodate growth; (7) increasing transfer capability between distribution circuits; and (8) reducing line losses. A ninth objective is to achieve all eight objectives "at the lowest costs that is consistent with minimizing the environmental impacts of the project." FEIS at 1-7 to 1-8.
¶ 11 Alternative 4 proposes rebuilding about 28 miles of existing transmission line while it is "hot" or energized and the Alternative 2 line would not be built. Alternative 4 proposes replacing the existing 45 MW conductor with a 110 MW capacity conductor and associated switches and structures. The existing distribution system would mostly be rebuilt "hot." The distribution system rebuild proposes replacing about 90 percent of the 593 existing structures with structures 10 feet taller. Transformers would have to be moved to the new distribution structures, requiring realigning or reconstructing 25 to 30 percent of the power lines to individual customers. Alternative 4 proposes replacing 239 existing transmission line structures using about 32.7 miles of existing access road with otherwise unnecessary heavy blade work, but just 0.2 acres of new track road. The estimated capital cost of Alternative 4 is $16 million.
¶ 12 According to the FEIS, Alternative 4 fully meets just five project objectives. Alternative 2 does not require rebuilding either the existing transmission line or the existing Methow Valley floor distribution circuits because the new line will relieve most of the load from the existing line. The existing line will require ongoing routine evaluation, maintenance and repair, but no rebuilding in the foreseeable future. The FEIS includes those estimated maintenance and repair costs, but does not include the existing line as a part of the Alternative 2 analysis.
¶ 13 In April 2006, the Citizens unsuccessfully challenged the PUD decision and the FEIS sufficiency in the Okanogan County Superior Court. The court entered a final order dismissing all claims. Citizens appealed.

SEPA/EIS REVIEW STANDARDS
¶ 14 SEPA requires an EIS describing the environmental impacts and assessing alternative proposals for "major actions significantly affecting the quality of the environment." RCW 43.21C.030(2)(c)(i)-(iii). We review EIS adequacy de novo, and give statutorily required substantial weight to the agency's determinations. Klickitat County Citizens Against Imported Waste v. Klickitat *328 County, 122 Wash.2d 619, 632, 860 P.2d 390, 866 P.2d 1256 (1993); City of Des Moines v. Puget Sound Reg'l Council, 108 Wash.App. 836, 849-50, 988 P.2d 27 (1999); RCW 43.21C.090. We review the agency's EIS adequacy decision, not the superior court's decision. Citizens, 122 Wash.2d at 632, 860 P.2d 390. Because no administrative fact finding is involved, our review is entirely de novo. Our focus is to determine whether the environmental effects of the proposed action are disclosed, discussed and substantiated by opinion and data. Solid Waste Alternative Proponents (SWAP) v. Okanogan County, 66 Wash.App. 439, 442, 832 P.2d 503 (1992).
¶ 15 EIS adequacy is assessed according to the "rule of reason," which requires a "`reasonably thorough discussion of the significant aspects of the probable environmental consequences of the agency's decision.'" Citizens, 122 Wash.2d at 633, 860 P.2d 390 (quoting Cheney v. City of Mountlake Terrace, 87 Wash.2d 338, 344-45, 552 P.2d 184 (1976)). The EIS purpose is to facilitate the decision-making process; it need not list every remote, speculative, or possible effect or alternative. Id. at 641, 860 P.2d 390. Thus, the EIS discussion of alternatives need not be exhaustive, but must present sufficient information for a reasoned choice among alternatives. SWAP, 66 Wash. App. at 442, 832 P.2d 503.

ANALYSIS

A. Cumulative Impacts
¶ 16 The issue is whether the FEIS is legally deficient for failing to consider rebuilding the existing transmission line as a "connected action" to Alternative 2 under a cumulative impacts analysis.
¶ 17 The SEPA regulations require agencies to consider certain "connected" or "closely related" actions together in a single EIS. "Connected actions" are proposals or parts of proposals which are closely related under WAC 197-11-060(3). See WAC 197-11-792(2)(ii). As stated in WAC 197-11-060(3):
(b) Proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action shall be evaluated in the same environmental document. . . . Proposals or parts of proposals are closely related, and they shall be discussed in the same environmental document, if they:
(i) Cannot or will not proceed unless the other proposals (or parts of proposals) are implemented simultaneously with them; or
(ii) Are interdependent parts of a larger proposal and depend on the larger proposal as their justification or for their implementation.
WAC 197-11-060(3)(b)(i), (ii). See Indian Trail Property Owner's Ass'n v. City of Spokane, 76 Wash.App. 430, 443, 886 P.2d 209 (1994).
¶ 18 SEPA does not define "cumulative impacts." Additional projects do not require review in an EIS for cumulative impacts if they are either substantially independent from the proposed action or are not necessary to meet the project's purpose and need. Mountlake Terrace, 87 Wash.2d at 345, 552 P.2d 184 (explaining dependent actions); SEAPC v. Cammack II Orchards, 49 Wash.App. 609, 614, 744 P.2d 1101 (1987) (EIS need not cover subsequent phases if initial project is substantially independent of subsequent phase and project would be constructed without regard to future development); see also WAC 197-11-060(3)(b)(ii).
¶ 19 The National Environmental Policy Act (NEPA)[1] regulations define "cumulative impact" as "the impact from the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; see Florida Wildlife Federation v. U.S. Army Corps of Eng'rs, 401 F.Supp.2d 1298, 1326, 1330 (S.Dist.Fla. 2005) (applying reasonably foreseeable future actions test); Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir.1985) (future action foreseeable if it is sufficiently certain); Sierra Club v. Marsh, 976 F.2d 763, 767 (1st Cir.1992) *329 (impact reasonably foreseeable when sufficiently likely to occur that person of ordinary prudence would take it into account in reaching decision).
¶ 20 Factually, the FEIS explains that Alternative 2 does not contemplate or require a rebuild of the existing transmission line within the foreseeable future in order to meet the project's purpose and need for a reliable source of electricity into the Methow Valley. Because the existing line will be a secondary or backup line, it will be subject to different performance criteria than is required for a single radial transmission line. The FEIS discusses the role of the existing transmission line as a reliable backup line (redundant line) with ongoing maintenance and repair, as opposed to rebuilding.
¶ 21 The FEIS defines maintenance as the routine inspection, repair and replacement of worn or damaged components. The maintenance and repair protocol includes periodic replacement of structures, poles, insulators, and other components of the existing system as needed as part of routine PUD operations, with no significant change in current maintenance strategy required.
¶ 22 Citizens disagree, arguing the new transmission line was never intended to stand alone, but is just an incremental first step in achieving redundant power. They argue the existing transmission line's end is in sight and the PUD intends to rebuild the existing transmission line within 10 to 15 years. They insist no credible evidence supports the PUD's position that the existing transmission line can serve as a reliable backup line into the future. But Citizens' cited FEIS passages refer solely to the necessary, routine maintenance and periodic replacement of components, not reconstruction.
¶ 23 Citizens' administrative record citations are unavailing. First, they argue PUD Commissioner David Womack admitted "down the road" the existing transmission line will have to be rebuilt "cold." Administrative Record (AR) 18298. But, the commissioner actually advocated for Alternative 2 because it was the choice with the "highest redundancy." Id. He stated, "I believe that the current line over the Loup will work for a back up line for many years to come. And years down the road we can upgrade the loup COLD at a lower cost. The [new] route will allow the PUD to provide maintenance on both lines cold which would be safer and at a cost savings to all customers." Id. (emphasis in original). Thus, the document does not suggest a rebuild of the existing transmission line is imminent, or that a "hot" rebuild is preferable.
¶ 24 Citizens next cite to a statement by PUD chief engineer Derek Miller in response to dissenting PUD Commissioner Don Johnson's conclusion that the Loup Loup line is reaching the end of its serviceable life. But Mr. Miller actually stated if the Pateros-Twisp line was built, "then this existing Loup Loup line could serve as a back-up electrically for 11 to 12 months a year, and into the future for 10 to 15 years; depending on load growth in the Methow Valley." AR 1492. This passage does not suggest a rebuild of the existing line is imminent and does not address the life of this existing line when improved by routine maintenance/repair.
¶ 25 Next, Citizens cite PUD consultant Foster Wheeler's environmental analysis that advised the existing transmission line's conductors were "old and fatigued," and that it was "possible or even probable" that it would need to be rebuilt by 2016, "even if the Twisp/Pateros line were built." AR 908, 926. Citizens take the passages out of context. AR 908 discusses the hazards and technical issues associated with a "hot" reconstruction of the existing line and that the existing conductor is "old and fatigued." AR 926 discusses one of the rejected alternatives, and notes the possibility or probability that the Loup Loup line would need to be rebuilt "eventually." AR 933 discusses the existing transmission line rebuild option becomes borderline for capacity and voltage within 15 years, not that it would be maintained as a secondary line.
¶ 26 Citizens cite to an e-mail by PUD former manager Chuck Berrie to argue the existing transmission line's poles were degraded to a point where many may be structurally unsound. But the e-mail merely requests Derek Miller to get bids for testing *330 the poles to address the line's condition and get any needed repairs.
¶ 27 Citizens rely on a 1999 newspaper editorial opinion of PUD former general manager Harlan Warner, who opined that based upon the existing transmission line's condition, it would need to be rebuilt in about 10 years. Other individuals wrote similar newspaper editorials in 1998. But these opinions all stemmed from pre-EIS preliminary project assessments and do not address the viability of regular maintenance and repair as defined in the FEIS.
¶ 28 Citizens dispute certain PUD calculations favoring Alternative 2. For example, that the existing transmission line serving as a secondary line would be able to meet the performance level of serving 80 percent of the load carried by the primary line. Currently, the line has a 45 MW capacity. The peak demand known to date occurred in January 2004 at 34 MW. Thus, to exceed the 80 percent performance standard, the peak load into the Methow Valley would have to exceed 56 MW (56 × .80 = 44.8 MW). The Foster Wheeler report estimated that the Methow Valley load will increase to 39.7 MW by the year 2020. This is well within the existing 45 MW capacity and far short of the 56 MW failure level.
¶ 29 Citizens erroneously assume that the existing transmission line has a 35 MW capacity, but it is 45 MW. The Appendix G data upon which they rely contains an admitted typographical error. And they rely on a portion of the Foster Wheeler report that discusses the projected load by 2020 for the entire Okanogan County district, as opposed to just the Methow Valley. Thus, from a capacity standpoint, the FEIS shows that under Alternative 2, the existing transmission line will meet industry service level standards for the projected population for the foreseeable future with regular maintenance and repair.
¶ 30 Citizens contend Alternative 2 and an existing line rebuild are "connected actions" as a matter of law under SEPA. They emphasize the FEIS and the Foster Wheeler report boast of a looped transmission system in which redundant transmission lines will act in tandem. Citizens argue the FEIS never expressly states that the new line is intended to function independently and is merely an incremental step in a single strategy to improve transmission.
¶ 31 But these arguments do not support a connected action claim because Citizens misconstrue the meaning of the term "redundancy" as applied to the existing transmission line's new role as a secondary or backup line while the new Pateros-Twisp line serves as the main transmission line. Citizens does not persuade us that building the new line while maintaining the existing line is merely a strategy to achieve redundancy for the existing line.
¶ 32 Citizens also fail the "connected" or "single cause of action" tests of WAC 197-11-060(3)(b)(i) and (ii). As discussed, the FEIS adequately explains that Alternative 2 can proceed without rebuilding the existing transmission line. This is because routine maintenance of the existing line will enable it to fulfill its role as a secondary line in the improved radial grid system. Under WAC 197-11-060(3)(b)(i), Alternative 2 can proceed without implementing a Loup Loup line rebuild.
¶ 33 On its face, Alternative 2 is independent of any existing line rebuild, and vice versa. As the FEIS explains, Alternative 2 will meet all eight project objectives without requiring a Loup Loup line rebuild. Citizens' speculation over population increases and service demand exceeding 80 percent does not make Alternative 2 and the existing line rebuild "interdependent parts of a larger proposal and depend on the larger proposal as their justification or for their implementation." WAC 197-11-060(3)(b)(i), (ii).
¶ 34 Citizens next argue Alternative 2 fails the federal "independent utility" test for connected actions that must be assessed in a single EIS. The test focus is "when each of the two projects would have taken place with or without the other and thus had `independent utility.'" Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1118 (9th Cir.2000); see also Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 580 (9th Cir.1998). As analyzed, there is no requisite "but for" relationship between Alternative *331 2 and rebuilding the existing transmission line. Alternative 2 requires regular maintenance on the Loup Loup line, but not a rebuild. If Alternative 2 is completed, any future rebuild of the existing line would, on its face, have independent utility.
¶ 35 Florida Wildlife Federation v. U.S. Army Corps of Engineers, 401 F.Supp.2d 1298 does not help Citizens. There, the court held the Corps was aware of the county's future build-out of a road when issuing a permit to allow dredging and filling wetlands as a first phase of a 30-year development project. The Corps determined that the first phase had "independent utility" and that cumulative impacts of subsequent phases did not have to be addressed in the initial EIS. Id. at 1305-06. Unlike Florida Wildlife, the PUD does not intend a similar linkage and does not view Alternative 2 as a unified whole. This is not a case where the "theory of `independent utility' on a record such as this, can only be considered a post-hoc rationalization to secure a permit as rapidly as possible." Id. at 1323.
¶ 36 Citizens mistakenly reason that constructing the new line irretrievably commits the PUD to building and maintaining two transmission lines. But unlike the several phases that were considered a unified whole in Florida Wildlife, the FEIS contains sufficient information to show Alternative 2 is not an incremental step in the overall proposal. This leads to a reasonable conclusion that building the new line does not also irretrievably commit the PUD to rebuilding the existing line in the foreseeable future. The FEIS properly analyzes the impacts and costs associated with the PUD's commitment to maintaining both transmission lines.
¶ 37 None of Citizens' cited cumulative impacts cases are controlling. Citizens' additional cited case, Boehm v. City of Vancouver, 111 Wash.App. 711, 47 P.3d 137 (2002) is not helpful. In Boehm, the court stated that a cumulative impacts analysis need only occur if there is "some evidence" that the project under review will facilitate future action that will result in additional impacts. Id. at 720, 47 P.3d 137. But cumulative impacts were only speculative in that case when the Boehms failed to demonstrate that the project was dependent on any subsequent development. Id.
¶ 38 When, like here, any future project is not dependent on the proposed action, no cumulative impacts analysis is required. Id.; Mountlake Terrace, 87 Wash.2d at 343-45, 552 P.2d 184 (evaluation of cumulative impacts of future development not required when proposed road was independent of the development); Cammack II Orchards, 49 Wash.App. at 614, 744 P.2d 1101 (EIS need not consider impacts of subsequent phases when initial phase is substantially independent and would be constructed without regard to future developments). Since an existing Loup Loup line rebuild is not probable but only hypothetical and speculative, SEPA does not require that it be considered in an EIS. WAC 197-11-782; see Mountlake Terrace, 87 Wash.2d at 345-46, 552 P.2d 184. This contrasts with King County v. Boundary Review Board, 122 Wash.2d 648, 665, 860 P.2d 1024 (1993), where it was probable, and uncontested, that future development of annexed property would have a significant adverse environmental impact. Id.
¶ 39 Citizens contend in their reply brief that the PUD has already estimated, in detail, the economic cost and environmental impact of rebuilding the existing transmission line "cold" in conjunction with Alternative 6, which was rejected. They argue a cumulative impacts analysis of a "hot" rebuild is likewise feasible and should be included in the FEIS in conjunction with Alternative 2. This argument fails to recognize that a cold rebuild of the existing line would be required under Alternative 6 because the Pateros-Twisp line would not be built.
¶ 40 In sum, we reject Citizens' contention that necessary cumulative impacts were not analyzed and conclude that the FEIS satisfies the rule of reason.

B. Environmental Impacts and Economic Costs
¶ 41 The issue is whether the FEIS was inadequate under the rule of reason regarding environmental impacts and economic costs by understating for Alternative 2 and exaggerating for Alternative 4.
*332 ¶ 42 When an EIS involves considering alternatives, WAC 197-11-440(5)(c) requires that the document:
. . . .
(v) Devote sufficiently detailed analysis to each reasonable alternative to permit a comparative evaluation of the alternatives including the proposed action. The amount of space devoted to each alternative may vary. One alternative (including the proposed action) may be used as a benchmark for comparing alternatives. The EIS may indicate the main reasons for eliminating alternatives from detailed study.
(vi) Present a comparison of the environmental impacts of the reasonable alternatives, and include the no action alternative.
WAC 197-11-440(5)(c)(v), (vi). The EIS discussion of alternatives need not be exhaustive, but must present sufficient information for a reasoned choice. SWAP, 66 Wash.App. at 444, 832 P.2d 503. Similarly, under NEPA, an EIS must contain sufficient economic information to enable an accurate assessment of alternatives and informed decision. See Or. Envtl. Council v. Kunzman, 817 F.2d 484, 492 (9th Cir.1987).
¶ 43 Generally, the FEIS contains a 32-page appendix detailing and comparing all aspects of costs for each alternative, including cost estimate differences between the DEIS and FEIS, cost models used, detailed tables on all aspects of costs including for roads, construction, operations and maintenance, mitigation, and cost savings comparisons. Included are detailed tables supporting alternative engineering cost estimates. The FEIS addresses alternative ground disturbance for both roads and structures and shows the natural resource impacts. The FEIS discusses in detail the amount and quality of track roads and track road blade work needed to construct and maintain each alternative. The FEIS sufficiently responds to the public comment concerns related to Alternative 2. We turn now to Citizens' three main concerns.
¶ 44 1. Alternative 2 Estimates. To minimize new road construction, Alternative 2 plans to use existing roads and track roads, as well as helicopters for delivering pole structures. The FEIS specifies that 21.6 miles of track road and blade work are needed for Alternative 2. Alternative 4 would use 32.7 miles of existing road access with some blade work necessary. The FEIS makes clear that, overall, Alternative 2 will require considerably more new track road and blade work, resulting in 28.7 acres of road-related ground disturbance, as compared with 0.2 acre under Alternative 4. Citizens disagree with the machinery and helicopter use estimates in Alternative 2 and theorize more ground disturbance will result due to heavy equipment needed to excavate in rocky ground, and trucks must deliver heavy safety shoring for 227 hand-excavated structure holes.
¶ 45 But the FEIS adequately explains why heavy excavation equipment is not required. The FEIS addresses the type of road access needed for the required excavation equipment. Shoring is not required because crew members do not enter the hole during backfilling. The FEIS adequately explains why hover-time for delivery helicopters over installation sites will be limited to about 5 to 10 minutes while the structure is backfilled and stabilized. Citizens' conclusory disagreement with the FEIS analysis does not render the FEIS deficient.
¶ 46 Citizens fault the FEIS for allowing new track roads to be established by "cross country" driving, while not accounting for degradation to highly erodible soils from the heavy truck traffic. This argument misconstrues the context of the FEIS statement that shows establishing a road by "cross country" driving merely means that more invasive blade work measures will not be required.
¶ 47 All told, the FEIS adequately discloses and discusses the ground disturbance and road and machinery issues associated with Alternative 2. Moreover, the track road system described in the FEIS is not "vague" and "unquantified." The FEIS, in Appendix B at 1-3 and 7-12, contains maps clearly showing the approximate locations of existing roads and where track roads and blade work would be required under each alternative. *333 In sum, the FEIS is sufficiently detailed in its estimates to comply with SEPA.
¶ 48 2. Alternative 4 Impacts and Costs. Citizens incorrectly argue the FEIS exaggerates the environmental impacts and costs of Alternative 4 because it arbitrarily ignores that roads and structure pads for that alternative already exist. But the FEIS explains that the 32.7 miles of existing access roads are unsurfaced dirt roads that have been maintained to allow passage of PUD work trucks that are generally one-ton or smaller. Although just 0.2 acres of new track road would be required in Alternative 4, considerable portions of the existing roads would need additional blade work to accommodate larger "hot rebuild" machinery required for transmission line construction.
¶ 49 Citizens next argue the ground disturbance descriptions for Alternative 4 are exaggerated. But their citations to the record miss the mark because their argument ignores the existence of an existing, and largely sufficient road system for rebuilding the existing line that is clearly identified in the FEIS relating to Alternative 4, which explains the blade work need on limited portions.
¶ 50 Citizens' additional reply brief citation to conclusions in the Foster Wheeler report that using and expanding existing right-of-ways under Alternative 4 would be the least environmentally degrading is beside the point. The FEIS considered the existence of right-of-ways in its analysis, noting that the existing right-of-way grant for the existing transmission line does not cover reconstruction.
¶ 51 We are not persuaded by Citizens' arguments that the FEIS exaggerates the structure-caused ground disturbance for Alternative 4. While structure pads already exist in Alternative 4, the FEIS thoroughly discusses the structure pad concept and gave reasonable estimates for associated ground disturbance. The DEIS estimated pad replacement would require 1,260 square feet per site and later "hot" replacement of four of the structures was consistent, even though an October 2005 e-mail estimate and a photo presentation contained lower estimates. The FEIS explains Alternative 4 would require hot rebuilding of the existing distribution system entailing removal of approximately 90 percent of the 593 existing structures and replacing them with 10-foot taller structures. In sum, Citizens does not show the FEIS information is exaggerated or incorrect.
¶ 52 3. Cost Comparisons. Finally, Citizens assert that other electrical cost comparisons between Alternatives 2 and 4 were inaccurate and biased. They challenge the FEIS determination that Alternative 2's Gold Creek substation could substitute for Alternative 4's upgrade of the lower valley distribution system. They argue the decision made Alternative 2 perhaps $3 million less expensive than Alternative 4. But the FEIS explains the cost of Alternative 4 is higher than Alternative 2 because a hot rebuild of a transmission line is more labor intensive; requires more specialized equipment; and takes longer than constructing a new line, resulting in additional costs. Alternative 4 requires an extensive rebuild of the distribution system not required in Alternative 2.
¶ 53 The FEIS explains how the Gold Creek substation will resolve multiple distribution problems by providing a new point of distribution in addition to those existing at Twisp and Pateros. Main feeder loads will be reduced by one-half. Existing distribution feeder capacity problems will be resolved. Loads may be switched from one circuit to another when a distribution or transmission failure occurs, reducing line losses by about one-half. Additional switches would reduce feeder length by one-half between Twisp and Gold Creek and Pateros and Gold Creek. The FEIS describes about six miles of distribution line construction for Alternative 2, but it will not require other new construction of the distribution system because the Gold Creek substation will improve voltage levels in the lower valley, satisfying all four distribution objectives without other major projects.
¶ 54 Contrary to Citizens' argument, the Foster Wheeler report recommends essentially the same sort of distribution system construction improvements as described in the FEIS. Citizens cite a citizen group letter at Appendix G-758 submitted during the *334 DEIS process, but those alleged distribution deficiencies and problems were found unsubstantiated, inaccurate and based upon misconception. Citizens' additional argument that the PUD's own handouts reflect the need to rebuild the distribution system within 15 years is not supported by their citations to the record.
¶ 55 Citizens next argue the PUD ignored equally viable express feeders to improve the distribution system recommended in the PUD's 1999 long-range plan in an effort to make Alternative 4 look more expensive. The FEIS summarily rejects their use. But Citizens provide no cost-benefit analysis as to why express feeders would have been preferable.
¶ 56 Finally, Citizens claim FEIS bias against Alternative 4 relating to the type of conductors needed for an existing transmission line rebuild. The PUD proposes a heavy "556 ACSR" conductor requiring replacement of all structures on the existing transmission line, while rejecting the lower cost, lighter-weight 336 composite core conductors proposed by Citizens. But the FEIS explains that a larger 556 ACSR conductor would be needed for the Alternative 4 single transmission line in order to provide equivalent capacity to that which would be provided under Alternative 2, where additional capacity comes from the addition of the new line. Because Alternative 4 does not include additional lines, the larger conductors are required. Even considering the smaller conductor cost, the total savings would be at most $1.7 million. The costs of Alternative 4 would still be $12.4 million, versus $8.87 million for Alternative 2. The labor cost of a hot rebuild, not increased conductor costs, is the largest portion of the cost variance.
¶ 57 In sum, Citizens' claims of PUD deception and bias and FEIS inaccuracy are not supported by the record. The FEIS sufficiently discusses and estimates the environmental impacts and economic costs of Alternatives 2 and 4 to permit a reasonable comparison of alternatives as required by SEPA. The FEIS satisfies the rule of reason.

C. Arbitrary and Capricious
¶ 58 Finally, Citizens contend the PUD commissioners' adopting of Alternative 2 was arbitrary and capricious because it was based upon an inaccurate, incomplete, and biased FEIS. They explain that while PUD commissioners have broad discretion in their exercise of power, exercise of that discretion is not unfettered and commissioners cannot act arbitrary and capricious. Saldin Sec., Inc. v. Snohomish County, 134 Wash.2d 288, 294, 949 P.2d 370 (1998). An agency's action is arbitrary and capricious when it is willfully unreasonable, without consideration, and in disregard to facts and circumstances. Buell v. City of Bremerton, 80 Wash.2d 518, 526, 495 P.2d 1358 (1972). Given our analysis, Citizens fails to show arbitrary and capricious actions by the PUD.

CONCLUSION
¶ 59 The environmental effects of the proposed action are adequately disclosed, discussed and substantiated by opinion and data in the FEIS. SWAP, 66 Wash.App. at 442, 832 P.2d 503. The FEIS satisfies the rule of reason. Citizens, 122 Wash.2d at 633, 860 P.2d 390. Citizens do not show arbitrary and capricious PUD action.
¶ 60 Affirmed.
WE CONCUR:, KULIK, A.C.J. and KORSMO, J.
NOTES
[1] NEPA decisions may be used to help interpret SEPA issues. See, e.g., Kucera v. Dep't of Transp., 140 Wash.2d 200, 224, 995 P.2d 63 (2000).