IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

PUBLIC UTILITY DISTRICT NO. 1 OF )  No. 29121-9-III
OKANOGAN COUNTY, a municipal )  Consolidated with
corporation, )  No. 29123-5-III
)
Respondent/ )
Cross Appellant, )
)
v. )
)
STATE OF WASHINGTON, PETER )
GOLDMARK, Commissioner of Public )
Lands, )
)
Respondent/ )  PUBLISHED OPINION
Cross Appellant, )
)
and )
)
CONSERVATION NORTHWEST, a )
nonprofit corporation, )
)
Appellant, )
)
and )
)
CHRISTINE DAVIS, a single person, )
TREVOR KELPMAN, a single person, )
DAN GEBBERS and REBA GEBBERS, )
husband and wife, and WILLIAM C. )

WEAVER, custodian for Christopher C. )
Weaver, a minor, )
)
Respondents, )

KULIK, J. — More than 15 years ago, the Okanogan County Public Utility District No. 1 (PUD) began the process required to construct a new transmission line and substation between Pateros and Twisp in the Methow Valley. Following a decade of environmental review and litigation, PUD obtained an environmental impact statement (EIS). Next, PUD needed to obtain easements over the proposed land. PUD negotiated with approximately 85 percent of the property owners for easements on their land. Ultimately, PUD filed a petition for condemnation against the remaining property owners. This included the State,[1] which owned school trust lands that were required for the project.

Conservation Northwest (CNW), a group engaged in conservation activities, filed a motion to intervene. The court granted CNW's motion. Both CNW and the State filed motions for summary judgment, arguing that PUD lacks the authority to condemn school trust land. The State stipulated to the entry of the order on public use and necessity, which addressed the narrow issues of whether the transmission line project was a public

---

[1] We refer to the following parties collectively as the "State:" Christine Davis, Trevor Kelpman, Dan Gebbers, Reba Gebbers, William Weaver, Peter Goldmark, and the

use and whether the easements sought were reasonably necessary for that use.

The court denied the State's and CNW's motions, granted summary judgment in favor of PUD, and entered findings of fact, conclusions of law, and an order on public use and necessity.

CNW appealed, challenging the order of summary judgment, in addition to the order on public use and necessity. PUD then cross appealed, challenging the trial court's order granting intervention to CNW. The State also appealed the summary judgment order, contending that PUD had no statutory authority to condemn the State trust lands at issue here.

We conclude that the State trust lands may be condemned as a matter of law. We affirm summary judgment in favor of PUD and the denial of summary judgment to the State and CNW. Given that we affirm the trial court's order on the PUD's condemnation authority, we need not address the PUD's cross appeal challenging CNW's limited intervention.

## FACTS

*Introduction.* In 1889, Washington became a state. At that time, the federal government granted to Washington approximately three million acres of land for

---

State of Washington.

educational purposes and the support of common schools. Enabling Act, ch. 180, §§ 10, 11, 25 STAT. 676 (1889). The lands consisted of sections 16 and 36 of each township in Washington. *Id.* Section 11 of the Enabling Act reserved these lands for "school purposes only" and set forth certain restrictions on their sale and lease to ensure that the lands would derive to the sole benefit of Washington schools. *Id.* This concern is echoed in the Washington Constitution. The Constitution provides that all "public lands granted to the state are held in trust for all the people" and restricts the manner in which such trust lands may be disposed. CONST. art. XVI, § 1.

The Department of Natural Resources (DNR) is the state agency charged by the legislature with the management of these lands. In 1957, the management responsibilities were consolidated in DNR, which was created to provide effective and efficient management of these state lands. RCW 43.30.010, .030. Peter Goldmark, the elected Commissioner of Public Lands (Commissioner), serves as the administrator of DNR. The Commissioner is a member of the Board of Natural Resources that establishes policies regarding the appropriate management of state lands and resources. RCW 43.30.205, .215.

DNR has been granted the exclusive statutory authority and discretion to lease trust lands for various purposes, including commercial, agricultural, and recreational uses. RCW 79.13.010.

In 1996, Okanogan PUD proposed a new transmission line to improve electrical service to the citizens of Methow Valley. PUD sought to construct the transmission line and substation between Pateros and Twisp (hereinafter the "project").[2]

From the initial planning for the project in 1996, the project has been subject to extensive scrutiny. *Gebbers v. Okanogan County Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 376, 183 P.3d 324, *review denied*, 165 Wn.2d 1004, 198 P.3d 511 (2008). As part of the review, PUD and the U.S. Forest Service prepared a draft EIS seeking input from citizens, environmental groups, and governmental agencies. Fifteen alternatives were identified and six alternatives and a no-action alternative were approved for consideration. PUD conducted two public hearings, held several public meetings, and responded to over 400 public comment letters. *Id.* A final EIS was released in March 2006, and PUD made its selection later that month. *Id.*

---

[2] A lengthy discussion of the project is contained in this court's opinion in *Gebbers v. Okanogan County Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 183 P.3d 324, *review denied*, 165 Wn.2d 1004, 198 P.3d 511 (2008).

Following 10 years of environmental review, the superior court and this court affirmed PUD's decisions regarding the project and the sufficiency of the final EIS. *Id.* at 393. We held that the environmental effects of the project were adequately disclosed, discussed, and substantiated in the final EIS. We also held that PUD did not act arbitrarily and capriciously in selecting the transmission line route. *Id.* The Supreme Court denied review. *Gebbers*, 165 Wn.2d at 1004.

PUD negotiated the easements required for the project with approximately 85 percent of the property owners along the transmission line route, but eventually filed eminent domain proceedings against the remaining owners, including the State. The State lands in question are school trust lands managed by the DNR. PUD filed its amended petition for condemnation on April 14, 2010.

At summary judgment on the condemnation petition, CNW argued that the proposed Pateros-Twisp transmission line would bisect the largest contiguous publicly owned shrub-steppe habitat in the Methow Valley and would have multiple adverse environmental impacts, including the introduction of noxious weeds, fragmentation of wildlife habitat, increased fire risk, and exacerbating erosion and sedimentation.

The State argued that it leased these lands for cattle grazing to generate money for trust beneficiaries and to preserve this land as a part of the trust corpus for the benefit of

6

future generations. To this end, the State had entered into enforceable leases for the use of these parcels and had issued permits to allow for cattle grazing on certain parcels. In total, the proposed Pateros-Twisp transmission line would cross state trust lands that are subject to five active grazing leases and two grazing permit range areas. These leases and permits actively generate income to benefit Washington schools.

However, the leases on the property generate less than $3,000 annually for the school beneficiaries, not including DNR administrative costs. PUD's proposed easements pass over no more than an estimated 4 percent of the area of any one lease and as little as 0.02 percent for one of the leased areas. PUD modified the project to eliminate all permanent road construction within the project.

*Intervention.* Prior to the hearing on public use and necessity, CNW filed a motion to intervene as a respondent in support of the State. It is undisputed that CNW has no legal or equitable property interest in the trust lands. CNW states: "The issue at stake in this litigation . . . directly affects Conservation Northwest's ability to continue its work as a representative and protector of state trust land and its ability to protect its own interests as an organization involved in land conservation." Clerk's Papers (CP) at 603. Despite opposition by PUD, the superior court granted limited intervention under CR 24.

7

*Motions for Summary Judgment.* Following intervention, both CNW and the State filed separate motions for summary judgment, arguing that the PUD does not have the authority to condemn school trust lands. PUD also filed a motion for summary judgment.

The court rejected this statutory argument and concluded that PUD has the express authority to condemn school trust lands under RCW 54.16.020 and .050. The court also rejected the contention that school trust lands cannot be subject to condemnation because they are dedicated to a public use.

The trial court entered orders denying summary judgment to CNW and the State, and granting summary judgment to PUD on the issue of condemnation authority. Because the State did not otherwise oppose an order on public use and necessity, the court also entered its "Findings of Fact, Conclusions of Law, and Order on Public Use and Necessity." CP at 14-18.

*Appeals.* CNW filed a notice of appeal challenging the summary judgment in PUD's favor, as well as the order on public use and necessity. PUD then cross appealed the order granting intervention to CNW. The Attorney General declined to appeal the trial court's decision despite the Commissioner's request that it do so. Subsequently, the State filed a contingent notice of appeal of the order denying summary judgment and the order on public use and necessity. Later, the Washington Supreme Court ruled that the

Attorney General was required to prosecute an appeal on behalf of the Commissioner.

*Goldmark v. McKenna*, 172 Wn.2d 568, 259 P.3d 1095 (2011). The State then continued

this appeal with special counsel.

## ANALYSIS

After the PUD filed its condemnation petition, the State and CNW filed separate

motions for summary judgment arguing that PUD does not have the authority to condemn

the school trust lands. The State concedes that PUD has the statutory authority to

condemn, but the State argues that the school trust lands in question are not subject to

condemnation because they are already devoted to a particular use by law. CNW argues

that chapter 54.16 RCW does not grant PUD express authority to condemn. CNW

abandoned this argument on appeal. CNW adopts the State's arguments. CNW argues

that state school lands are dedicated to a public use as a matter of law.

This court reviews the trial court's summary judgment orders de novo. *Moeller v.

Farmers Ins. Co.*, 173 Wn.2d 264, 271, 267 P.3d 998 (2011). We engage in the same

inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93

P.3d 108 (2004).

The property in dispute is designated school trust land. Significantly, chapter 1,

section 6(e) of the LAWS OF 1931, codified at RCW 54.16.050, specifically authorizes

public utility districts to condemn school lands for transmission lines. RCW 54.16.050

reads, in part, that a public utility district

> may take, *condemn* and purchase, purchase and acquire any public and
> private property, franchises and property rights, *including* state,
> county, and *school lands*, and property and littoral and water rights, *for
> . . . transmission lines, and all other facilities necessary or convenient.*

(Emphasis added.)

The PUD statute itself does not contain any limitation on the type of state land that

may be condemned. RCW 54.16.050. However, the definition of "state lands" in the

public lands act, Title 79 RCW, excludes lands "devoted to or reserved for a particular

use by law." RCW 79.02.010(14)(h).[3] The critical issue here is whether these school

lands are dedicated to a particular purpose or use and, therefore, are not subject to

condemnation.

A. *Dedicated to a Public Purpose.* On appeal, the State argues that all school

trust lands are dedicated to a public purpose and are, therefore, per se exempt from

condemnation.

The State's argument is not persuasive for several reasons. First, the public lands

act defines "state lands" as including school trust lands "that are not devoted to or

---

[3] We refer to the current version of RCW 79.02.010; subsequent amendments
renumbered the sections and were not substantive.

10

reserved for a particular use by law." RCW 79.02.010(14)(h). This means that not all school lands are so reserved or there would be no need for the qualifier. Second, the State's interpretation would render meaningless the many statutes that specifically allow local government to condemn state and school trust lands. *See, e.g.*, RCW 8.12.030 (cities and towns); RCW 53.34.170 (port districts), and RCW 54.16.050 (public utility districts).

Finally, the State's argument ignores Washington Supreme Court precedent. In *Roberts v. City of Seattle*, 63 Wash. 573, 574, 116 P. 25 (1911), the city of Seattle instituted an action to condemn a 30-foot strip of university grounds. The court concluded that no provision in the Enabling Act or the Constitution provided that school lands could not be sold. *Id.* at 575. The court held that the fact that school trust lands are devoted to the purpose of financing education was insufficient to exempt the property from condemnation. Moreover, the court stated:

> It is also argued that the land taken was already devoted to a public use—that of education—and therefore cannot be taken for another public use. There is nothing in the record to indicate that the 30-foot strip of land in question is actually in use by the university, and there is nothing to indicate that the taking of the strip of land will impair the use of the land remaining. On the other hand, the record shows that the remaining land will be benefited. Under this condition it may be taken.

*Id.* at 576.

11

Dedication to a public use reserves the land from subsequent sale. Contrary to the assertions of the State, dedication to a public use requires more than simply putting the property to a productive use. The Washington Supreme Court has described dedication as: (1) dedication by act of the legislature;[4] (2) "platted, dedicated, and reserved" land for a public use;[5] (3) segregating the land from the public domain and appropriating it to the public by "due dedication,"[6] and dedication by some "official act or declaration."[7] Most significantly, the Supreme Court held that devotion to the purpose of education is insufficient to prevent condemnation. *Roberts*, 63 Wash. at 576.

The State reads *State v. Jefferson County*, 91 Wash. 454, 157 P. 1097 (1916) to hold that sovereign lands cannot be condemned. However, *Jefferson County*, which did not involve trust lands, held that the authority to sell or condemn sovereign lands must not be presumed, but must be expressly conferred by statute. *See Jefferson County*, 91 Wash.

---

[4] *State v. Jefferson County*, 91 Wash. 454, 455-56, 157 P. 1097 (1916) (waterway permanently reserved from sale by statute).

[5] *Id.* at 455.

[6] *City of Tacoma v. Taxpayers of Tacoma*, 49 Wn.2d 781, 797, 307 P.2d 567 (1957), *rev'd on other grounds*, 357 U.S. 320, 78 S. Ct. 1209, 2 L. Ed. 2d 1345 (1958). While this case did not explain how the land was dedicated, the case stated that the land was "dedicated."

[7] *City of Tacoma v. State*, 121 Wash. 448, 452, 209 P. 700 (1922). PUD argues that "dedicated to a public use" is the functional equivalent of "devoted to or reserved for a particular use by law." *See* RCW 79.02.010(14)(h).

12

at 458-59. And the PUD condemnation statute expressly allows for the condemnation of school lands. RCW 54.16.050.

Since *Roberts*, the Supreme Court has continued to approve the condemnation of school trust lands, and other types of trust lands, even though they exist for the purpose of serving various trust beneficiaries. *See City of Seattle v. State*, 54 Wn.2d 139, 147, 338 P.2d 126 (1959); *City of Tacoma v. State*, 121 Wash. 448, 453, 209 P. 700 (1922). The State argues that *Roberts*, *City of Tacoma*, and *City of Seattle* are erroneous. The trial court disagreed, and so do we.

In *City of Seattle*, the city of Seattle instituted a condemnation proceeding to acquire state school and capitol building lands for use in its proposed Tolt River aquifer. *City of Seattle*, 54 Wn.2d at 141. The court concluded that the city had the power to condemn state property that was not dedicated to a public use. *Id.* at 147. In *City of Tacoma v. Taxpayers of Tacoma*, 49 Wn.2d 781, 801, 307 P.2d 567 (1957), *rev'd on other grounds*, 357 U.S. 320, 78 S. Ct. 1209, 2 L. Ed. 2d 1345 (1958), the court concluded that the city lacked the statutory authority to condemn state lands previously dedicated to a public use. State lands not dedicated to a public use are subject to condemnation. *City of Seattle*, 54 Wn.2d at 147. Here, the school lands are not dedicated to a public use and are, therefore, subject to condemnation.

13

B. *Reservation from Sale.* As stated above, under RCW 79.02.010(14)(h), school trust lands are reserved if they are "devoted to or reserved for a particular use." In *City of Seattle*, the court found that the capitol building trust lands—which are of the same character as school trust lands—were not devoted to or reserved for a particular use by law:

> It is admitted by the state in this action that the capitol building lands which the city of Seattle seeks to condemn are not devoted to or reserved for a particular use but are subject to sale. If the legislature had intended to exempt such state lands from condemnation, it would seem that it would have expressly so limited the term "state lands," as used in RCW 8.12.030. . . . This the legislature did not see fit to do, and the realtor suggests no reason why such a limitation should be inferred.

*City of Seattle*, 54 Wn.2d at 147.

In other words, reservation from sale is critical to determining whether public lands have been reserved for a particular purpose. In *Fransen v. Board of Natural Resources*, state forest lands were found to be reserved for a particular purpose by law because they are "'forever reserved from sale.'" *Fransen v. Bd. of Natural Res.*, 66 Wn.2d 672, 673, 404 P.2d 432 (1965) (quoting former RCW 76.12.120, *recodified as* RCW 79.22.050 (Laws of 2003, ch. 334, § 220)). *Jefferson County* explained that dedicated land is "'severed from the mass of public lands, [so] that no subsequent law, or proclamation, or sale would be construed to embrace it, or operate upon it.'" *Jefferson*

14

*County*, 91 Wash. at 459 (quoting *State v. Whitney*, 66 Wash. 473, 488, 120 P. 116 (1912)).

School lands are subject to sale. The lands at issue here are not devoted to or reserved for a particular use by law. Moreover, the school trust lands here are not dedicated to a public use. The State cannot show that the trust lands at issue have been dedicated to a public use. Likewise, the State cannot argue that these trust lands are dedicated to a public use simply because they may be actively managed by DNR.

The fact that the State leased the trust lands for grazing does not reserve those lands for a particular use by law. Even trust lands subject to grazing leases shall not be sold during the life of the lease. RCW 79.11.290. And here, the specific leases involved reserve the State's right to sell the property, reserving the right to sell upon 60 days' notice.

In short, the sale of leased school trust lands is simply limited to certain conditions, but these conditions are insufficient to fall within the statutory language of "devoted to or reserved for a particular use by law." RCW 79.02.010(14)(h).

Furthermore, leased lands are not devoted to a particular use by RCW 79.13.370. This provision merely states that once a grazing lease is issued, the lessee may only use the land for the purposes set forth in the lease. *Id.*

15

C. *Trusts.* CNW argues that school lands are exempt from condemnation because they are public trusts.

The Washington Enabling Act and Constitution impose an express trust and corresponding trust management principles on state trust lands, including the land at issue here. *County of Skamania v. State*, 102 Wn.2d 127, 132, 685 P.2d 576 (1984) (citing Washington Enabling Act § 11, 25 STAT. 676 (1889), *amended by* Act of August 11, 1921, 42 STAT. 158, and Act of May 7, 1932, 47 STAT. 150; CONST. art. XVI, § 1); *see* 1996 Op. Att'y Gen. No. 11 (Question 1); *O'Brien v. Wilson*, 51 Wash. 52, 97 P. 1115 (1908); *United States v. 111.2 Acres of Land*, 293 F. Supp. 1042, 1048-49 (E.D. Wash. 1968), *aff'd*, 435 F.2d 561 (9th Cir. 1970).

In *O'Brien v. Wilson*, the Washington Supreme Court rejected the application of adverse possession statutes to common school trust lands, holding that "'[Washington] accepted the trust, and by its Constitution solemnly covenanted with the United States to apply the granted lands to the sole use of its schools according to the purpose of the grant, and prohibited the sale of any portion of the granted land except at public sale.'" *O'Brien*, 51 Wash. at 56-57 (quoting *Murtaugh v. Chicago, Milwaukee & St. Paul Ry.*, 102 Mn. 52, 55, 112 N.W. 860 (1907)).

16

In short, the examination of the language of Washington's Enabling Act and Constitution reveal that state trust lands are administered under trust management principles to benefit public schools as the trust beneficiaries and are subject to statutory controls and authority.

Regardless of the trust's purpose, the legislature granted PUDs the authority to condemn state trust lands. RCW 54.16.050 authorizes the condemnation of state and school lands.

A statute shall not be interpreted in a manner that renders a provision meaningless or creates an absurd or strained result. *Pierce County v. State*, 144 Wn. App. 783, 852, 185 P.3d 594 (2008). The State and CNW assert that the PUD does not have authority to condemn trust land generally or the trust land here. But following this logic, RCW 54.16.050 would have meaningless terms that would create an absurd result.

D. *Easements.* Regardless of whether a sale is at issue, by the State's own admission, easements can be granted over trust lands for grazing. Here, PUD does not seek fee ownership of school trust lands. In addition to PUD's express condemnation authority under RCW 54.16.050, the legislature also reserved PUD's right to condemn easements over state lands in DNR's land management statutes:

> The foregoing sections relating to the acquiring of rights-of-way and overflow rights through, over and across lands belonging to the state, shall

17

not be construed as exclusive or as affecting the right of municipal and public service corporations to acquire lands belonging to or under control of the state, or rights-of-way or other rights thereover, by condemnation proceedings.

RCW 79.36.580.

The State contends the trust lands at issue are dedicated to a public use because they are actively managed by DNR. But all school trust land is managed by DNR in some capacity as required under state law. *See, e.g.*, RCW 79.10.090 (requiring periodic analysis of all trust lands).

E. *Compatibility.* The State maintains that the courts look only at dedication to a public use when determining whether condemnation is allowed.

The State misinterprets several precedents in making this assertion. For example, in *City of Tacoma* the condemnation at issue involved the right to divert water from a fish hatchery and the right to condemn a 250-foot strip of the school lands. *City of Tacoma*, 121 Wash. at 450. In analyzing whether Tacoma could condemn the right to divert waters flowing past the fish hatchery, the court explained:

This property is now devoted to a public use, and if the proposed diversion of the waters of the North fork would destroy this public use, or so damage it as to preclude its successful operation, our inquiry would end here.

*Id.* at 453.

The court ultimately found that the public use would not be destroyed and that diversion would even benefit the hatchery. *Id.* Citing *Roberts*, the Supreme Court held that condemnation was permissible, despite the fact that the property was already devoted to a public use. *Id.* The court also held that *Roberts* authorized the condemnation of the 250-foot strip of school trust lands. *Id.*

PUD points out, and the State does not dispute, that the easements will not destroy the current uses of the State's trust land. In fact, PUD takes the position that the proposed easements will benefit the economic purpose behind the trust lands by providing revenue through compensation for the easements while still allowing the continuation of grazing.

Significantly, the State does not challenge its own leases, which contain specific provisions that address the condemnation of all or part of the leased land "by any public authority." CP at 240 (section 10.06). These provisions not only recognize that condemnation can occur, they allow for continuation of the leases after condemnation if the parties desire.

When managing the grant lands, DNR may consider only those factors consistent with ensuring the economic value and productivity of the federal grant land trusts. *See, e.g.*, 1996 Op. Att'y Gen. No. 11 (Question 5(c)). The condemnation of the easements will not negatively impact the economic productivity of the trusts.

19

F. *Conclusion.* We affirm the denial of summary judgment to the State and CNW and affirm the order on public use and necessity. Given our disposition in favor of the PUD, we need not address its cross appeal related to the trial court's grant of limited intervention to CNW.

_____
Kulik, J.

WE CONCUR:

_____       _____
Korsmo, C.J.                Siddoway, J.