

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 29 2015

CHIEF JUSTICE



This opinion was filed for record
at 8:00 AM on Jan. 29, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

PUBLIC UTILITY DISTRICT NO. 1 OF OKANOGAN COUNTY, a municipal corporation,

        Petitioner/Cross-Appellant,

        v.

STATE OF WASHINGTON, PETER GOLDMARK, Commissioner of Public Lands,

        Petitioner/Cross-Respondent,

        and

CONSERVATION NORTHWEST, a nonprofit corporation,

        Petitioner/Cross-Respondent,

        and

CHRISTINE DAVIS, a single person, TREVOR KELPMAN, a single person, DAN GEBBERS and REBA GEBBERS, husband and wife, and WILLIAM C. WEAVER, custodian for Christopher C. Weaver, a minor,

        Respondents.

NO. 88949-0

EN BANC

Filed    JAN 29 2015

STEPHENS, J.—This case arises from the protracted history between Public Utility District No. 1 of Okanogan County (PUD) and the Department of Natural Resources (DNR)[1] over the installation of an electrical transmission line through school lands managed by DNR in the Methow Valley. At issue is whether PUD is statutorily authorized to condemn a right of way through school trust lands for the construction of a transmission corridor and, if so, whether the particular school lands are nonetheless exempt from condemnation as a result of their trust status as school lands or present use for cattle grazing. The trial court and Court of Appeals concluded that PUD is statutorily authorized to condemn school lands and that the particular school lands at issue are subject to condemnation. We affirm.

## FACTS AND PROCEDURAL HISTORY

PUD is a nonprofit, public utility district tasked with the conservation of the state's water and power resources and the supply of public utility services to residents in Okanogan County. *See* LAWS OF 1931, ch. 1, § 1. To supply electricity to the region, PUD operates a high voltage transmission line connecting Twisp, Okanogan, and Pateros (the Loup-Loup line) and a lower voltage distribution line from Pateros to Twisp (the Methow-Valley Floor line). The existing system has long experienced reliability, capacity, and line loss problems. *Gebbers v. Okanogan County Pub. Util. Dist. No. 1*, 144 Wn. App. 371, 375, 183 P.3d 324 (2008). As a result, residents have suffered excessive and costly line

---

[1] DNR, Peter Goldmark, and the State are referenced herein collectively as DNR.

losses and frequent power outages. *Id.* These problems are expected to increase as the service population in that region grows. *Id.*

In 1996, PUD proposed the installation of a new higher capacity transmission line from Pateros to Twisp that would run roughly parallel to the existing Methow-Valley Floor line. Progress on the project slowed when PUD was required to conduct an extensive environmental impact study (EIS). In 2003, PUD and the United States Forest Service (USFS) held a public scoping period, encouraging members of the public, environmental groups, and governmental agencies to assist them in identifying areas of public concern. In 2004, PUD and the USFS released a scoping report. The report identified 15 alternatives, but only 6 alternatives and a no-action alternative were ultimately approved for detailed consideration in light of the project's objectives.[2] In January 2005, PUD released an extensive draft EIS report describing the viability of each alternative and its anticipated impact on air and soil quality, erosion, vegetation, fish, and wildlife. *Id.* at 376. PUD thereafter held several public hearings and meetings and responded to over 400 letters submitted during the comment period. *Id.*

In February 2006, PUD indicated its preferred plan was "Alternative 2," which involved the installation of a new transmission line from Pateros to Twisp

---

[2] The project's objectives are (1) reducing transmission line voltage drops, (2) ensuring transmission capacity to accommodate anticipated load growth, (3) reducing transmission line related outages, (4) reducing existing transmission line losses, (5) reducing voltage drops on the distribution circuits, (6) ensuring distribution capacity to accommodate growth, (7) increasing transfer capability between distribution circuits, and (8) reducing line losses at the lowest cost while minimizing adverse environmental impacts. *Gebbers*, 144 Wn. App. at 377-78.

(the Pateros-Twisp line). *Id.* at 376-77. The Pateros-Twisp line meets all of the project's objectives, provides a secondary backup power source for the area, and is significantly less expensive than simply upgrading the existing Loup-Loup line. *Id.* at 377-78. The Pateros-Twisp line is a modified version of the original 1996 plan. *Methow Transmission Project Summary: Final Envtl. Impact Statement* at S-6 (Mar. 2006), https://www.okanoganpud.org/sites /default/files/pdfs/environ-mental_generation/methow_transmission/feis/Summary.pdf. The principal change eliminated all permanent road construction, requiring PUD to use temporary track roads, hand-dig holes, and deliver structures by helicopter. *Id.*

Installation of the Pateros-Twisp line requires PUD to obtain an 11.6-mile easement across school lands managed by DNR. Br. of Resp't PUD – PUD Statutory Condemnation Auth. at 7-8. These lands were granted to the state in trust for the people and for the support of a common school fund. They comprise a portion of the largest publicly owned tract of shrub-steppe habitat in the Methow Valley. Appellant/Cross-Resp't Conservation Northwest's Suppl. Br. at 1. The lands are currently leased for cattle grazing and generate approximately $3,000 of annual income for the benefit of Washington schools. Clerk's Papers (CP) at 232, 252, 273, 298, 319. The grazing leases expressly recognize that they are subject to the easement rights of others and provide remedies in the event that all or part of the land is condemned by a public authority. *See, e.g., id.* at 233, 240.

PUD released a final EIS report on March 7, 2006, indicating its preference for Alternative 2. *Gebbers*, 144 Wn. App. at 376. The PUD commissioners

officially selected Alternative 2 for the project later that month. *Id.* Various citizen groups subsequently filed suit challenging the sufficiency of the EIS report under the State Environmental Policy Act, chapter 43.21C RCW, and the prudence of the commissioners' selection. 144 Wn. App. at 378-79. The trial court dismissed these challenges, and the Court of Appeals affirmed. *Id.* at 393. We denied review. *Gebbers v. Okanogan County Pub. Util. Dist. No. 1*, 165 Wn.2d 1004, 198 P.3d 511 (2008).

While the EIS challenges were pending, PUD applied for the necessary easements through the school lands using DNR's easement application process. CP at 125-26. Between May 2007 and February 2010, PUD and DNR communicated extensively about the proposed easements. *Id.* PUD submitted a formal application in October 2008 and was told the application would take approximately two to three months to process. *Id.* at 126. PUD's application has been pending now for over five years. PUD Answer to Amicus Curiae Br. of Western States Land Comm'rs Ass'n at 16. And, approximately 18 years have passed since the project was proposed in 1996.

In 2010, PUD filed a petition to condemn the necessary easements for the project. Prior to condemnation hearing on public use and necessity, Conservation Northwest (CNW), a group engaged in conservation activities, moved to intervene. CP at 594-606. DNR objected. The trial court granted CNW limited intervention to address the scope of PUD's condemnation authority. *Id.* at 506-08. CNW and DNR filed separate motions for summary judgment, arguing PUD does not have

the authority to condemn the subject school lands given their trust status and present use as grazing land. *Id.* at 460-505. The trial court denied CNW's and DNR's motions and granted summary judgment in favor of PUD, concluding PUD has the authority to condemn the subject school lands. *Id.* at 22-24.[3]

The Court of Appeals affirmed the trial court's determination that PUD has the authority to condemn the relevant school lands, but did not address the propriety of CNW's intervention. *Pub. Util. Dist. No. 1 of Okanogan County v. State*, 174 Wn. App. 793, 301 P.3d 472 (2013). The court held that the subject school lands were not exempt from condemnation because they were not dedicated to a public use by virtue of their trust status or reserved for a particular purpose in light of their grazing leases. *Id.* at 802-07. Additionally, the court held that even if the lands were devoted to a public use or reserved for a particular purpose, PUD could still condemn an easement through them because PUD's proposed use is compatible with DNR's present use. *Id.* at 807-08.

DNR petitioned for review on the issue of condemnation, and PUD sought cross review on the issue of intervention. We granted review. *Pub. Util. Dist. No. 1 of Okanogan County v. State*, 178 Wn.2d 1025, 312 P.3d 652 (2013).

---

[3] Appellate review of the trial court's decision was stayed in order to resolve a dispute regarding the Washington State Attorney General's duty to represent the commissioner of public lands in the matter. *Goldmark v. McKenna*, 172 Wn.2d 568, 572, 259 P.3d 1095 (2011).

ANALYSIS

I. Limited Intervention of Conservation Northwest

The trial court granted CNW limited intervention under CR 24 to address whether PUD has the authority to condemn school lands. As a threshold matter, PUD contends that CNW's intervention in this case is contrary to law. PUD argues that RCW 8.12.120 supersedes CR 24 and allows only those with compensable land interests (i.e., those with real property interests) to be parties in a condemnation proceeding. Alternatively, PUD argues that the trial court's CR 24 analysis was in error. We disagree.

*A. RCW 8.12.120 Does Not Prohibit Intervention by Those Challenging a Condemnor's Authority to Condemn Certain Property*

Chapter 8.12 of the Revised Code of Washington sets out the process of condemnation proceedings brought by public utility districts.[4] RCW 8.12.120 in particular provides that in condemnation proceedings, a jury shall "ascertain the just compensation to be paid to any person claiming an interest" in the property taken or damaged. Accordingly, the statute requires that "[s]uch person shall first be admitted as a party defendant to said suit by such court." *Id.* PUD contends that CNW cannot intervene in this case because it has no compensable property interest and thus is not a party defendant who must be joined under RCW 8.12.120.

---

[4] Although chapter 8.12 RCW's procedural requirements by their terms pertain solely to the exercise of condemnation powers by cities and towns, the legislature has extended these requirements to the exercise of condemnation powers by public utility districts. RCW 54.16.020.

PUD's analysis makes a critical misstep by reading RCW 8.12.120 as restricting a court's power of joinder. While the statute *requires* the joinder of particular parties, it does not *prohibit* a court from exercising its authority under the court rules to join individuals challenging a condemnor's authority with respect to certain property. In *City of Tacoma v. Taxpayers of Tacoma*, 49 Wn.2d 781, 793, 307 P.2d 567 (1957),[5] we acknowledged the special statutory scheme for condemnation actions but held it did not prevent a court from hearing an action questioning the scope of a condemnor's authority. At issue was whether Thurston County had jurisdiction to consider a challenge to the city of Tacoma's power to condemn lands that were not located in either Pierce County (where the action had commenced) or Thurston County (where the action was transferred). The trial court concluded it did not have jurisdiction over the matter because condemnation actions are in rem actions and the subject lands were outside the court's geographical reach. *Id.* at 794. We reversed, explaining that an action regarding the scope of an entity's condemnation powers is "*not* a condemnation action." *Id.* at 793. The teaching point of *Taxpayers of Tacoma* is that chapter 8.12 RCW should not be read restrictively. While this is a condemnation action, there is no conflict between joining party defendants under RCW 8.12.120 and joining others under the civil rules.

---

[5] Because we cite to another case involving the City of Tacoma, we refer to this case hereinafter as "*Taxpayers of Tacoma*" to avoid unnecessary confusion. We also recognize that *Taxpayers of Tacoma* was reversed by the United States Supreme Court, 357 U.S. 320, 78 S. Ct. 1209, 2 L. Ed. 2d 1345 (1958), on res judicata grounds inapplicable to the propositions for which the case is cited in this opinion.

We have long recognized the ability of adjacent landowners to question the *power* of a condemnor to take certain property notwithstanding their lack of compensable land interests in the matter. *See State ex rel. N. Pac. Ry. v. Superior Court*, 136 Wash. 87, 90-91, 238 P. 985 (1925) (listing cases). PUD's reliance on *Port of Grays Harbor v. Bankruptcy Estate of Roderick Timber Co.*, 73 Wn. App. 334, 869 P.2d 417 (1994), and *Public Utility District No. 1 of Snohomish County v. Kottsick*, 86 Wn.2d 388, 545 P.2d 1 (1976), is unavailing. Neither case questioned the scope of a condemnor's authority. Instead, they concerned whether certain individuals qualified as "condemnee[s]" under RCW 8.25.075(1) so as to entitle them to an award of attorney fees. *Port of Grays Harbor*, 73 Wn. App. at 337; *Kottsick*, 86 Wn.2d at 389-90. In this case, CNW does not seek to assert a property interest or to claim entitlement to fees, but rather simply to challenge the scope of PUD's condemnation authority. Because RCW 8.12.120 does not address this situation, we consider whether CNW's intervention was proper under CR 24.

> B. *The Trial Court Did Not Abuse Its Discretion in Allowing CNW To Intervene under CR 24*

CR 24 provides two independent means by which a party can intervene. *Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd.*, 127 Wn.2d 759, 765, 903 P.2d 953 (1995). Subsection (a) addresses when a party is entitled to intervene as a matter of right, and subsection (b) addresses the

conditions for permissive intervention. CR 24(a), (b). The trial court granted CNW limited intervention under CR 24(b). We affirm.[6]

We review a trial court's decision granting permissive intervention under CR 24(b) for abuse of discretion. *In re Recall Charges Against Butler-Wall,* 162 Wn.2d 501, 507, 173 P.3d 265 (2007). "'An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court.'" *Westerman v. Cary,* 125 Wn.2d 277, 304, 892 P.2d 1067 (1994) (internal quotation marks omitted) (quoting *In re Dependency of J.H.,* 117 Wn.2d 460, 472, 815 P.2d 1380 (1991)). An error of law necessarily constitutes an abuse of discretion. *Sales v. Weyerhaeuser Co.,* 163 Wn.2d 14, 19, 177 P.3d 1122 (2008).

CR 24(b) states in pertinent part that "anyone may be permitted to intervene in an action . . . [w]hen an applicant's claim or defense and the main action have a question of law or fact in common." It further provides that "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." CR 24(b)(2). PUD argues that CR 24(b) plainly requires that permissive intervenors have an independent claim or defense in addition to commonality of law or fact. Suppl. Br. of Resp't PUD at 3; Br. of Appellant PUD on Intervention at 24; Reply Br. of Appellant PUD on Intervention at 12, 13 n.15. According to PUD, a claim or defense is independent only if it is different from those brought by the existing

---

[6] The trial court also concluded that CNW was entitled to intervene under CR 24(a). We do not address the court's analysis under subsection (a) because we affirm its analysis under subsection (b).

parties.[7] PUD concludes that CNW does not have an independent claim or defense because CNW and DNR make the same basic argument, namely that PUD does not have the authority to condemn school lands.

Contrary to PUD's analysis, our case law recognizes that an intervenor's interest is not adequately represented simply because similar relief is sought by another party. *Columbia Gorge Audubon Soc'y v. Klickitat County*, 98 Wn. App. 618, 628-30, 989 P.2d 1260 (1999) (allowing Yakama Nation to intervene even though it was "simply another voice asking for the same result . . . only for different reasons"). We have also repeatedly concluded that the state's general duty to protect the public's interest does not sufficiently protect the narrower interests of private groups. In *CLEAN v. City of Spokane*, 133 Wn.2d 455, 460-62, 474, 947 P.2d 1169 (1997), we allowed real estate developers to intervene in an action to defend a city ordinance that provided public support for the construction of a new parking garage in downtown Spokane even though their interests were aligned with the city. We concluded that the developers' interests were not "'adequately represented by existing parties'" because the city had a broader interest in protecting all of its residents, not just the limited commercial interests of the developers. *Id.* at 474 (quoting CR 24(a)(2)).

---

[7] This argument seems to be based on the possessive and conjunctive language of CR 24(b) and PUD's belief that any other reading would be contrary to the common law prohibition against third-party standing. *See* PUD's Answer to Pet. for Review at 18 (citing our standing analysis in *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802-04, 83 P.3d 419 (2004)).

Similarly, in *Loveless v. Yantis*, 82 Wn.2d 754, 756 n.1, 760, 513 P.2d 1023 (1973), we allowed neighboring homeowners and residents to intervene in order to oppose the construction of a multifamily condominium in their community. We rejected any argument that the intervenors' interests were per se adequately represented by the county simply because it too opposed the construction. *Id.* at 759. We explained that while their ultimate goal was aligned, their interests were not the same: "the county must consider the interests of all the residents of the county"; whereas "the affected property owners represent a more sharply focused and sometimes antagonistic viewpoint to that of the county as a whole." *Id.*

In light of this precedent, it was not an abuse of discretion for the trial court to conclude that CNW's interests in this litigation were not adequately protected by DNR's interests. Here, DNR is tasked with the protection of school lands for the interests of the general public and the support of schools. While DNR's interest also includes the protection of wildlife sanctuaries and shrub steppe lands, its interest is broader than the limited conservation interests of CNW.

Finally, PUD argues that the trial court abused its discretion in failing to consider the undue delay and prejudice that CNW's intervention would (and, according to PUD, has) caused. PUD points out that the litigation in this case has been protracted and that PUD has been prejudiced by having to respond to, rather than ignore, CNW's arguments. We are not persuaded. PUD has not shown that any delay in litigation was "undue" or that CNW's involvement unjustifiably prolonged litigation. Rather, the record shows CNW did not intervene in the

litigation until 2010 and had nothing to do with the mandamus question that was at issue in *Goldmark v. McKenna*, 172 Wn.2d 568, 259 P.3d 1095 (2011). Moreover, accepting PUD's reasoning would largely foreclose intervention because there is always "prejudice" that arises out of having to respond to an intervenor's arguments. We affirm the trial court's decision. The trial court did not abuse its discretion in permitting CNW to intervene on the limited issue of PUD's authority to condemn the subject lands.

II. Condemnation of School Lands

The central issue in this case involves DNR's and CNW's assertion that PUD is prohibited from exercising its eminent domain powers to condemn an easement through the subject school lands. The trial court and Court of Appeals rejected this argument, as do we.

"Eminent domain" is the power of a sovereign to condemn property for public use without the owner's consent. It is an "inherent" attribute of state sovereignty. *State ex. rel. Eastvold v. Yelle*, 46 Wn.2d 166, 168, 279 P.2d 645 (1955). States may delegate these powers to municipal corporations and political subdivisions, but such delegated authority extends only so far as statutorily authorized. *Taxpayers of Tacoma*, 49 Wn.2d at 796. The scope of a municipal corporation's condemnation authority is therefore a matter of statutory interpretation, which we review de novo.

PUD's condemnation authority is set forth in Title 54 RCW. It arose by initiative.[8] In the early 1920s, Washington State was experiencing rapid population growth and economic expansion, coupled with a strong labor movement. At the same time, access to electric power was becoming increasingly critical to modern life and central to economic progress. JAY L. BRIGHAM, EMPOWERING THE WEST: ELECTRICAL POLITICS BEFORE FDR 101 (1998). Control over electrical power was hotly debated in Washington and throughout the United States. *Id.* Although Seattle boasted that it had more electric ranges than any other city at the time, it ranked 36th among 93 American cities in the percentage of families with radios, suggesting that despite Washington's abundant supply of hydroelectrical potential, electricity was still a luxury commodity in many homes. *Id.*

Electric service to Washington's farms, ranches, and rural areas lagged even farther behind urban areas like Seattle. As of 1930, only 47 percent of Washington farms had electricity, and those with electricity paid exorbitant rates. *Id.* at 121. This disparity engendered public distrust of private utility companies and sparked a populist movement, led by the Washington State Grange, for allowing public municipal power companies to operate outside their municipal boundaries so that they could compete with private utility companies in rural areas. *Id.* The

---

[8] It was originally introduced as an initiative to the legislature but was defeated by opponents in the state senate. Jay L. Brigham, EMPOWERING THE WEST: ELECTRICAL POLITICS BEFORE FDR 121-22 (1998). The bill was then automatically placed on the general ballot election and approved by Washington voters in 1930. *Id.*

movement led to the passage of the initiative and the creation of public utility districts. *Id.* at 121-22; LAWS OF 1931, ch.1.

Regarding the authority of public utility districts to condemn school lands, RCW 54.16.050 provides:

> A district may take, *condemn* and purchase, purchase and acquire any public and private property, franchises and property rights, *including state, county, and school lands,* and property and littoral and water rights, for any of the purposes aforesaid, and for railroads, tunnels, pipe lines, aqueducts, *transmission lines,* and all other facilities necessary or convenient.

(Emphasis added.)[9] The parties do not dispute that the proposed condemnation at issue here was to advance an enumerated purpose. They, however, disagree over whether the subject school lands are exempt from condemnation by virtue of their trust status or present use for cattle grazing. Additionally, DNR and CNW argue that even if PUD is statutorily authorized to condemn the subject lands notwithstanding their trust status and present use, such authorization is unconstitutional and a breach of the state's fiduciary duties.

---

[9] We recognize the way the initiative was codified confuses how RCW 54.16.020, .040, and .050 relate to one another. The title to RCW 54.16.020 indicates that it pertains to the "[a]cquisition of property and rights—[e]minent domain," and RCW 54.16.040 indicates that it pertains to "[e]lectric energy," but neither includes authority to condemn school lands. In contrast, RCW 54.16.050 is titled "[w]ater rights" and specifically authorizes the condemnation of school lands for the installation of transmission lines. The framework of Laws of 1931, ch. 1, § 6 provides clarity on this matter. It indicates these provisions originated as part of a single section setting forth the scope of the condemnation powers of public utility districts and that RCW 54.16.050 was meant to be a catchall provision that applies to all "the purposes aforesaid." LAWS OF 1931, ch. 1, § 6(e).

### A. PUD Is Statutorily Authorized to Condemn School Trust Lands

"As is well known, the state holds title to property in two entirely distinct capacities, the one a proprietary capacity, as individuals generally hold property, and the other a governmental capacity, that is, in trust for the public use." *State v. Superior Court*, 91 Wash. 454, 458, 157 P. 1097 (1916). For condemnation purposes, a state may hold property in its governmental capacity regardless of whether the property is presently devoted to any actual public use. *Id.* at 459-60 (concluding the state's failure to use land in the 25 years since its appropriation as a waterway for said purpose did not revert the land back to proprietary status). We have deemed it "conclusively settled" that "a municipal corporation or a public corporation does not have the power to condemn *state*-owned lands dedicated to a public use, unless that power is clearly and expressly conferred upon it by statute." *Taxpayers of Tacoma*, 49 Wn.2d at 798 (emphasis added). When a political subdivision seeks to condemn state land held by the state in its governmental capacity, statutory authorization to condemn the particular *type* of land is not sufficient. Not only does the power to condemn a particular type of land need to be statutorily given, but the power to condemn such lands when they are held in the state's governmental capacity must be as well. *See State ex rel. Att'y Gen. v. Superior Court*, 36 Wash. 381, 385, 78 P. 1011 (1904) (noting strict statutory construction is necessary "where the lands of the sovereign are sought to be taken"). This requirement of strict statutory authorization is consistent historically

with other jurisdictions. A.M. Swarthout, Annotation, *Eminent domain: power of one governmental unit or agency to take property of another such unit or agency*, 91 L. Ed. 221, 259 (1946) (noting that "there is a clear tendency on the part of the courts against interpreting governing statutory provisions in favor of the existence of such authorization [to condemn property of the state] in the absence of a clear expression of the legislative intention to that effect").

While there is much debate about when state property is deemed governmental rather than proprietary, we need not concern ourselves with this question because the particular lands at issue are school trust lands, which are indisputably held in the state's governmental capacity. *See Soundview Pulp Co. v. Taylor*, 21 Wn.2d 261, 270, 150 P.2d 839 (1944) (recognizing that "[t]he state of Washington in its ownership of granted school lands . . . owns and holds them in its sovereign, as distinguished from its proprietary, capacity"); *State v. Nw. Magnesite Co.*, 28 Wn.2d 1, 26, 182 P.2d 643 (1947) (same). Thus, whether PUD is expressly authorized to condemn the subject school lands turns on whether the term "school lands" provided in RCW 54.16.050 refers to school trust lands.

Although the legislature has granted specifically to railroads the right to condemn "lands granted to the state for university, school or other purposes," RCW 81.36.010, this does not establish that the term "school lands" in RCW 54.16.050 must refer to something else. History shows that it does not.

In the Public Lands Act, LAWS OF 1927, ch. 255, § 1 (currently codified as RCW 79.02.010(14)(a)), which was adopted four years before the enactment of

RCW 54.16.050, the legislature used the term "school lands" as shorthand for "lands held in trust for the support of the common schools." While this explanation does not necessarily mean the legislature intended the same meaning in RCW 54.16.050, it is strong evidence of such intention. *Champion v. Shoreline Sch. Dist. No. 412,* 81 Wn.2d 672, 676, 504 P.2d 304 (1972) ("'Whenever a legislature had used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense.'") (internal quotation marks omitted) (quoting *State ex rel. Am. Piano Co. v. Superior Court,* 105 Wash. 676, 679, 178 P. 827 (1919)). This is particularly true in this case because the legislature has indicated that "[t]he rule of strict construction shall have no application to" Title 54 RCW and has directed that its provisions "be liberally construed, in order to carry out the purposes and objects for which this act is intended." LAWS OF 1931, ch. 1, § 11. Moreover, we have interpreted a similar provision granting cities and towns the authority to condemn "school lands" as expressly conferring on them the authority to condemn school trust lands. *See Roberts v. City of Seattle,* 63 Wash. 573, 116 P. 25 (1911); *City of Seattle v. State,* 54 Wn.2d 139, 338 P.2d 126 (1959). We see no reason to interpret RCW 54.16.050 differently, particularly when the legislature has not amended such language after these decisions and has directed us to liberally construe the statute's terms. *Buchanan v. Int'l Bhd. of Teamsters,* 94 Wn.2d 508, 511, 617 P.2d 1004 (1980) (noting the legislature's failure to amend a statute evinces agreement with judicial interpretation). We, therefore, hold that

RCW 54.16.050 expressly authorizes public utility districts to condemn school lands held in trust by the state. We next consider whether PUD is nevertheless prohibited from condemning the subject property because of its present use for cattle grazing.

### B. The "Prior Public Use" Doctrine Does Not Bar a Proposed Use That Is Compatible with the Present Use of the Land

The rule of express statutory authorization applies when corporations or political subdivisions seek to condemn property presently serving or intended to soon serve a public use, regardless of whether the property is owned by the state. 1A JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 2.17, at 2-58 (3d ed. 1964). The "general rule is that when the proposed use will either destroy the existing use or interfere with it to such an extent as is tantamount to destruction, the exercise of the power will be denied unless the legislature has authorized the acquisition either expressly or by necessary implication." *Id.*; *see Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 596, 73 P. 670 (1903) (explaining "the right to take property already devoted to and in public use must be given either in express terms or by necessary implication, and will not be presumed simply from a general grant of power to condemn"); A.S. Klein, Annotation, *Power of Eminent Domain as between State and Subdivision or Agency Thereof, or as between Different Subdivisions or Agencies Themselves*, 35 A.L.R. 3d 1293, 1305 (1971). This rule is commonly referred to as the doctrine of "prior public

use."[10]   While the precise origin of the doctrine is unclear, it is believed to have developed as a means of curtailing railroad companies from commandeering public highways through the exercise of their broad condemnation authority.   Note, *Reconciling Competing Public Claims on Land,* 68 COLUM. L. REV. 155, 156 (1968) (tracing the prior public use doctrine to *Inhabitants of Springfield v. Conn. River R.R.,* 58 Mass. 63 (1849)).

In this case, the lower court did not consider whether leasing state property for cattle grazing constitutes a "public use" because it found DNR's use to be compatible with PUD's proposed construction.   DNR and CNW argue that *any* present public use necessarily exempts property from condemnation; DNR asks for a "bright-line rule" that defers to DNR to decide in the first instance whether uses are compatible.   Appellants State of Wash. & Peter Goldmark's Suppl. Br. at 16.

Contrary to DNR's and CNW's contention, Washington recognizes that the prior public use doctrine does not apply when the prior use is compatible with the proposed use.   The flaw in DNR's and CNW's position stems from a

---

[10] We recognize that some jurisdictions have expanded the prior public use rule to forestall condemnations that would materially impair or interfere with an existing public use. NICHOLS, *supra*, § 2.17, at 2-58 to -60. And, others have limited its application to instances when both the condemnee and condemnor possess general powers of eminent domain. Note, *Reconciling Competing Public Claims on Land,* 68 COLUM. L. REV. 155, 159-60 (1968). We need not consider whether Washington applies an expansive or limiting construction at this time because PUD's proposed use does not impair or interfere with DNR's existing use so as to trigger the prior public use doctrine under any variant of the rule. Accordingly, while we recognize that jurisdictions apply different tests, we do not consider under what circumstances a condemnor may take property notwithstanding a *competing* public use. *See* Joris Naiman, Comment, *Judicial Balancing of Uses for Public Property: The Paramount Public Use Doctrine,* 17 B.C. ENVT'L AFF. L. REV. 893 (1990) (discussing various tests).

misapprehension of our early cases. As discussed, the analysis for determining a municipal corporation's authority to condemn state land held by the state in its governmental capacity is similar to that for determining a corporation's authority to condemn property already serving a public use. Both analyses require express statutory authorization and turn on the character of the property being condemned. The former, however, concerns the *power* to condemn and looks to whether the state has set aside state-owned property for public use so that the property is no longer held in its proprietary capacity. The inquiry does not depend on whether the property is actually being used for any present public use. *See Superior Court*, 91 Wash. at 455-56. In contrast, the prior public use doctrine does. It assumes the power to condemn exists and is concerned with the *exercise* of such power. The prior public use doctrine balances competing public uses and applies regardless of whether the property is state owned.

DNR and CNW misconstrue *Superior Court*. There, we did not hold that the presence of a public use precludes condemnation without exception. The issue in that case was whether a railroad was *authorized* to condemn state tidelands that had been designated (though never used) for public streets under a statute that permitted the condemnation of "'tide and shore lands belonging to the state.'" *Id.* at 457 (quoting REM. & BAL. CODE § 8740). Applying the general rule that authorization to condemn a particular type of land applies only to land held in the state's proprietary status, we held the railroad was not authorized to condemn tide lands held in the state's sovereign capacity. *Id.* at 458-61. As we explained, the

key issue was statutory authorization: "whether the state has granted to railway companies the right to condemn land which it has reserved and set apart for a public use." *Id.* at 461.

Similarly, the issue in *Taxpayers of Tacoma* was whether the City of Tacoma had the authority to condemn state lands that were dedicated to a public use as a fish hatchery in order to construct a dam. 49 Wn.2d 781. There, we were again faced with the issue of the power to condemn and whether the particular statutory authorization extended to sovereign lands (i.e., state lands dedicated to a public use). Applying the "conclusively settled" rule that "a municipal corporation or a public corporation does not have the power to condemn state-owned lands dedicated to a public use, unless that power is clearly and expressly conferred upon it by statute," we concluded that no statute endowed the city with such authority. *Id.* at 798.

*State ex rel. Attorney General* is yet another case regarding statutory authorization to condemn property held in the state's governmental capacity. At issue was whether a water corporation had the power to condemn school lands under a statute that authorized the condemnation of "'any land.'" 36 Wash. at 382 (quoting LAWS OF 1873, ch. 1, § 2, at 398). We held that while a water corporation had broad powers of condemnation, this power did not extend to school lands absent express authorization, as evinced by a similar statute specifically authorizing railroads (but not water corporations) to condemn school lands. *Id.* at 382-86. We never had to consider whether the water corporation's proposed use

was compatible with the state's use of the subject school lands because the water corporation was never authorized to condemn such lands in the first instance.

*City of Tacoma v. State*, 121 Wash. 448, 209 P. 700 (1922), also involved the condemnation of state lands and the question of statutory interpretation. In this case, the city wanted to erect a dam on the Skokomish River. In doing so, it sought to acquire by condemnation public lands once used as an "eyeing station" and to flood state property presently used as a fish hatchery. *Id.* at 450-51. The issues were whether the city needed express statutory authority to condemn the eyeing station and whether the city's proposed use was a competing public use with the fish hatchery. *Id.* at 451-53. We concluded express authorization was not required to condemn the eyeing station because the property at issue was proprietary, not governmental. It was proprietary because the deed conveying the property did not provide conditions for its use and the state never formally dedicated it to a particular use, was no longer using it, and had no intentions of using it in the future. *Id.* at 452. Because the fish hatchery was clearly a present public use, we then engaged in a prior public use analysis. *Id.* at 453. We considered whether the proposed dam would destroy or substantially interfere with the existing fish hatchery and concluded that it did not. *Id.*

To the extent our decision in *State ex rel. City of Cle Elum v. Kittitas County*, 107 Wash. 326, 173 P. 698 (1919), could be interpreted to support DNR's argument that property devoted to a present public use is per se protected from condemnation, we disavow such interpretation. In *City of Cle Elum*, Kittitas

County sought to build a county road through lands owned by the city and used as a water reservoir. *Id.* at 327. We concluded that Kittitas County did not have the power to condemn this land because it was statutorily authorized to condemn city property only for the construction of permanent highways, not county roads. *Id.* at 328-29. In dicta, however, we noted that even if Kittitas County had the power to condemn city property for the construction of county roads, such power did not extend to lands that were dedicated to a present or prospective public use. *Id.* at 330-31. While this statement may suggest that a present or prospective public use categorically exempts property from condemnation, it was not part of the court's holding and does not erode our otherwise clear precedent.

As we explained in *Superior Court*, once the question of power has been determined, then the issue may be about the superiority of rights between *competing* public uses. 91 Wash. at 460-61 (citing *State ex rel. Wash. Boom Co. v. Chehalis Boom Co.*, 82 Wash. 509, 144 P. 719 (1914)); *see State ex rel. Wash. Water Power Co. v. Superior Court*, 8 Wn.2d 122, 131-32, 111 P.2d 577 (1941) (listing cases where property was condemned to serve a greater public benefit). In condemnation actions between competing public uses, we have said that we consider "the present or prospective use of such property by the condemnee, the prospective use thereof by the condemner, the comparative advantages flowing to the public as between the ownership thereof by the condemnee and condemner, and the comparative advantage and disadvantages flowing to the condemnee and

condemner by the ownership of such property." *Wash. Boom Co.*, 82 Wash. at 514.

In *Roberts*, we held that the city of Seattle could condemn a particular strip of school lands for the widening of a road even though the land had already been devoted to a public use (i.e., education) because there was "nothing to indicate that the taking of the strip of land will impair the use of the land remaining." 63 Wash. at 576. In *City of Tacoma*, we likewise permitted the flooding of state lands presently devoted to a public use as a fish hatchery because the proposed flooding did not destroy or critically interfere with such use. 121 Wash. at 453. Like the courts in *Roberts* and *City of Tacoma*, the trial court in this case concluded that PUD's proposed use was compatible with DNR's present use and therefore did not consider which use should prevail.

DNR nevertheless cautions against allowing public utilities to condemn school lands simply because the proposed use is compatible with existing uses. DNR predicts such policy will lead to an ad hoc reduction of school lands. This argument fails to appreciate the strict public use and necessity prerequisites necessary for commandeering property through eminent domain, the express legislative authorization needed to reach school lands, and the requirement that the proposed use not destroy a present public use absent express authorization or necessary implication to do so. Moreover, whether the preservation of school lands should outweigh the interests of providing electricity to certain areas is a matter of public policy reserved for the legislature, not the court. The question

before us is one of pure statutory interpretation. Any reduction of school lands that may result from PUD's exercise of its condemnation powers is not due to judicial expansion, but rather express statutory authorization. Nor does our holding extend so far. As we discuss below, only the condemnation of an *easement* is at issue in this case; we have not considered whether condemnation of a fee interest in school lands would be constitutional.[11]

### C. The Washington State Constitution Does Not Prohibit the Condemnation of an Easement through School Lands

While a state can delegate its condemnation powers to its political subdivisions, it cannot delegate powers it does not have. A state's inherent condemnation authority, though broad, is limited by its constitutional provisions. Because PUD's condemnation authority derives from the state, its authority is similarly limited. DNR argues that condemnation of an easement through school lands violates the state constitution. We disagree.

None of the eminent domain provisions in our state constitution prohibit the condemnation of an easement through school lands. Article I, section 16 limits the

---

[11] Because the question before us is one of statutory interpretation, we do not regard the trial court's summary judgment order as resolving facts or making a "finding" of factual compatibility. PUD suggests that DNR abandoned its opportunity to present facts at trial and therefore cannot challenge whether its easement is compatible with DNR's management and use of the lands at issue. Br. of Resp't PUD at 42-45. But this overstates the court's holding and introduces the question posed by Justice Gonzalez's concurrence/dissent: whether DNR or CNW were denied an opportunity to make their case. While the Court of Appeals opinion may suggest it similarly regards DNR as having abandoned any fact-based challenges, we do not. The judicial determination that this case does not involve *competing* public uses was appropriate for summary judgment. There are no facts to resolve on the issue of compatibility that are not answered by the statutory scheme.

state's exercise of eminent domain over *private* property. CONST. art. I, § 16. Article XII, section 10 makes clear that the state's right to condemn property extends to that of incorporated companies. CONST. art. XII, § 10. And, section 19 delegates the state's right of eminent domain to telegraph and telephone companies. CONST. art. XII, § 19.

The provisions relating to school lands similarly do not prohibit condemnation of easements through such lands. Article XVI, section 1 states that school lands shall never "be disposed of unless the full market value of *the estate or interest disposed of* . . . be paid or safely secured to the state" and states that the manner of disposition and minimum price paid must comply with provisions set forth in Washington's enabling act, 25 Stat. 676 (1889). CONST. art. XVI, § 1 (emphasis added). Section 2 incorporates the public auction requirements from our enabling act, requiring that "[n]one of *the lands* granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder." CONST. art. XVI, § 2 (emphasis added).

PUD's condemnation of a right of way through school lands is consistent with these constitutional provisions because condemnation of an easement does not involve the sale of land in fee and requires payment of full market value. The plain language of section 2, when contrasted with that of section 1, strongly indicates that the drafters did not intend the sale of lesser land interests (e.g., easements) be subject to the public auction requirements of section 2. Had they so intended, they would have included similar "estate or interest" language in section 2 as appears in

section 1. Because PUD is not attempting to condemn a fee interest, we need not consider whether the public auction requirements of section 2 would prohibit condemnation of a fee interest.[12]

In *Roberts*, we explicitly rejected the notion that the condemnation of school lands is unconstitutional. 63 Wash. at 576. We held the condemnation of a 30-foot strip of university land was consistent with article XVI, section 1 of our state constitution and our enabling act because each provision permitted the sale of school lands so long as full market value was conferred. *Id.* at 575. We also noted that the price paid "had all the elements of a public sale" because it reflected the property's full market value. *Id.* at 576. We, however, did not expressly state whether the condemnation of school lands is consistent with the public auction requirement of article XVI, section 2. We now expressly consider section 2 and hold it does not require a different result in this case because it does not apply to the disposition of land interests less than fee.

---

[12] We note that the United States Supreme Court has interpreted a similar public auction requirement in the New Mexico-Arizona Enabling Act, 36 Stat. 557, as having no application to instances when the state seeks to appropriate school lands for another public use. *Lassen v. Arizona*, 385 U.S. 458, 464, 87 S. Ct. 584, 17 L. Ed. 2d 515 (1967). In particular, the Court recognized that in such case the public auction requirement would be an "empty formality" since no one would ever bid against a state knowing that the state could immediately condemn the property at the auction's closure. *Id. But see Deer Valley Unified Sch. Dist. No. 97 v. Superior Court*, 157 Ariz. 537, 540-41, 760 P.2d 537 (1988) (holding Arizona's constitution requires school lands be disposed of by public auction even though the public auction requirement in its enabling act does not); *State ex rel. Galen v. Dist. Court*, 42 Mont. 105, 114, 112 P. 706 (1910) (concluding condemnor could not acquire a fee interest in school lands).

### D. The Condemnation of School Lands Does Not Breach the State's Fiduciary Duties

Finally, DNR and CNW argue that even if PUD is statutorily authorized to condemn school lands, such grant of authority is a breach of the state's fiduciary duties as trustee of school lands. We disagree.

Article XVI, section 1 of our state constitution provides that "[a]ll the public lands granted to the state are held in trust for all the people and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interest disposed of . . . be paid or safely secured to the state" in a manner consistent with that prescribed by the federal government. The federal government's grant of school lands to the state provides that such lands shall be "held, appropriated, and disposed of exclusively for the purposes" of schools. Washington enabling act, 25 Stat. 676, ch. 180, § 17. We have interpreted these provisions as creating an enforceable trust with concomitant fiduciary duties on the state. *County of Skamania v. State*, 102 Wn.2d 127, 132-33, 685 P.2d 576 (1984). DNR contends the condemnation of school lands over its objections violates the state's fiduciary duties under *Skamania*.

*Skamania* is easily distinguishable. At issue in that case was whether the state could forgive contract obligations to the detriment of trust beneficiaries without considering the countervailing benefit to the public of doing so. Unlike *Skamania*, this case does not involve any injury to school beneficiaries because PUD is required to compensate the trust corpus for the full market value of the condemned interest. In *Lassen v. Arizona*, 385 U.S. 458, 469, 87 S. Ct. 584, 17 L.

Ed. 2d 515 (1967), the United States Supreme Court specifically addressed the use of school lands for other public uses and held that it does not violate a state's trust duties or its enabling act for a state to use school lands for noneducational purposes so long as the state compensates the trust for the full value of the interest taken. *See United States v. 111.2 Acres of Land*, 293 F. Supp. 1042, 1045 (E.D. Wash. 1968) (holding the donation of school lands would violate the provisions of the enabling act); *State v. Platte Valley Pub. Power & Irrig. Dist.*, 147 Neb. 289, 23 N.W.2d 300, 307 (1946) (concluding school lands can be condemned but that they must be paid for or else it would violate the state's trust obligations).

Congress did not expect states to hold school lands inviolate or for the sole use of schools. The federal government granted school land to Western states in order to encourage western migration. *See* MATTHIAS NORDBERG ORFIELD, FEDERAL LAND GRANTS TO THE STATES WITH SPECIAL REFERENCE TO MINNESOTA 41 (1915). In exchange for providing state property tax exemptions to new settlers, Western states were given federal land grants to support various public purposes, including schools. *Id.* States were expressly authorized to sell these lands in order to offset lost tax revenue. The grant "was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institutions designated by the Act. It was not supposed that [the State] would retain all the lands given it for actual use by the beneficiaries." *Lassen*, 385 U.S. at 463.

Nor was the federal grant of school lands intended to inhibit state growth or the building of critical infrastructures necessary for growth and self-governance. *Accord Ross v. Trs. of Univ. of Wyo.*, 30 Wyo. 433, 222 P. 3 (1924) (holding the use restrictions in the state's enabling act do not prevent the state from building public roads across university lands); *Hollister v. State*, 9 Idaho 8, 71 P. 541 (1903) (concluding Congress did not intend to prohibit the state from exercising its right of eminent domain over school lands), *overruled on other grounds by Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970) (relating to sovereign immunity). A necessary component of growth is the power to condemn school lands. As the United States Supreme Court explained,

> "[T]he object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people. . . ." The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.

*City of Cincinnati v. Louisville & Nashville R.R.*, 223 U.S. 390, 405-06, 32 S. Ct. 267, 56 L. Ed. 481 (1912) (quoting *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 547, 9 L. Ed. 773 (1837)). Recognizing that states may need to condemn school lands, Congress specifically amended Washington's enabling act to allow for such condemnation:

> The State may also, upon such terms as it may prescribe, *grant such easements or rights in any of the lands granted by this Act, as may be acquired in privately owned lands through proceedings in eminent domain*:

> *Provided, however,* That none of such lands, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, has been paid or safely secured to the State.

Enabling act, 25 Stat. 679-80, ch. 180, § 11 (1889), *as amended by* 47 Stat. 150, 151 (1932) (emphasis added).

DNR nevertheless insists that the state's fiduciary duties prohibit the state from authorizing the condemnation of school lands absent DNR's approval. DNR assumes that because it has been tasked with the management of school lands, it logically follows that it has ultimate decision-making authority over the use of such lands. Contrary to DNR's contention, the legislature has expressly indicated that it has *not* given DNR ultimate decision-making authority. Article III states that the office of the commissioner of public lands exists at the will and discretion of the legislature. CONST. art. III, §§ 23, 25. Under RCW 79.36.580, the legislature authorized DNR with the power to grant easements over public lands but explicitly states that such power "shall not be construed as exclusive or as affecting the right of municipal and public service corporations to acquire lands belonging to or under control of the state, or rights of way or other rights thereover, by condemnation proceedings."

## CONCLUSION

We hold that the trial court did not abuse its discretion in permitting CNW to intervene under CR 24(b) on the limited issue of PUD's condemnation authority. We further hold that RCW 54.16.050 expressly authorizes public utility districts to

condemn rights of way through school trust lands for the installation of electrical transmission lines. Such authorization is consistent with our state constitution and enabling act and the state's fiduciary duties to hold the land for the benefit of all the people and the support of schools.

_____ Stephens, J.

WE CONCUR:

_____ Madsen, C.J.

_____ Wiggins, J.

_____

_____

_____ Owens, J.

_____ Gordon McCloud, J.

_____ Fairhurst, J.

_____ Dwyer, J.P.T.

No. 88949-0

GONZÁLEZ, J. (concurring/dissenting)—I largely concur with the majority

opinion. I write separately, however, because I have significant doubt whether the

Department of Natural Resources's (DNR)[1] use of the lands is compatible with the

Public Utility District No. 1 of Okanogan County's (PUD) proposed use of easement.

In my view, courts should give due consideration to Conservation Northwest's

(CNW) environmental concerns when analyzing compatibility. Since the record does

not convince me that due consideration was made, I would remand to the trial court

for further findings on whether DNR's use is compatible with PUD's proposed use,

including consideration of CNW's environmental concerns. Because the majority

effectively brushes compatibility concerns aside, I dissent in part.

*A. The Trial Court's Findings*

> The trial court found:

> [T]here's no evidence that . . . a transmission line is not compatible with
> grazing leases or permits or that it will diminish income from grazing leases
> and permits. Cattle graze under power lines in many parts of Okanogan County
> and the state, including under the Loop Loop [sic] Route.

---

[1] DNR, Peter Goldmark, and the State are referenced herein collectively as DNR.

Tr. of Proceedings (TP) at 18. The trial court's conclusion finds some support in the record, though the trial court did not directly cite the record for its finding on compatibility and the record leaves me in more doubt than it does the majority. Derek Miller, chief engineer of PUD, declared that

> [a]fter completion, the transmission line will not impact or impair DNR's ability to lease (or continued use of) the land for cattle grazing or other uses. Based on my experiences with electric transmission lines in Okanogan County, the presence of a transmission line does not limit cattle grazing in the area under or near the line. Just one example of cattle grazing under and near electric transmission lines is the PUD's Loup Loup Transmission Line, which occupies an easement over DNR lands leased for grazing.

Clerk's Papers (CP) at 127.

The trial court also supported its conclusion on compatibility by reasoning that subsection 4.03 of DNR's leases "address[] compatible purposes. A transmission line is a compatible purpose." TP at 13. This citation is, at least, questionable. Subsection 4.03 of each of the five leases at issue actually provides that "[t]he State reserves the right to lease the premises for other uses which are compatible with the Lessee's permitted uses. The Lessee's permitted uses are set forth in Subsection 2.01." CP at 233, 253, 275, 299, 321. Subsection 2.01 of each of the five leases list "[g]razing" and sometimes also "[w]ildlife," but never "transmission line." *Id.* at 231, 251, 272, 297, 318. None of the leases indicate that a transmission line is a compatible purpose.

In issuing its ruling, the trial court noted that "[t]his case is before the Court on cross motions for summary judgment. All parties assert that there are no issues of

material fact and the judgment should be granted as a matter of law." TP at 5. This

may have been an unwise assertion by the parties. The trial court reasoned that "there

is no issue, but that the P.U.D.'s transmission line is compatible with grazing leases.

There's no evidence of any negative effect on grazing." *Id.* at 12-13.

*B. DNR Challenges the Issue of Compatibility*

DNR challenged the factual findings underpinning the trial court's conclusion

that the uses are compatible. First, DNR argued to this court that

> the trial court did not take testimony pertaining to the impacts of the proposed
> condemnation on the state's existing or future use of the land or otherwise cite
> to evidence submitted by the parties. Rather, the trial court based its ruling
> largely on its own observation that "cattle graze under power lines in many
> parts of Okanogan county . . . ."

Pet. for Review at 6 (quoting TP at 18).

Second, DNR challenged the trial court's compatibility finding on the grounds

that

> [t]he trial court did not take testimony to determine whether the PUD's
> proposal to erect towers, build roads and run transmission lines was actually
> compatible with DNR's existing and prospective use of these lands, and it
> lacked a sufficient basis to enter the factual finding underpinning its holding in
> this regard.

Appellants State of Wash. & Peter Goldmark's Opening Br. at 34, *cited in* Appellants

State of Wash. & Peter Goldmark's Suppl. Br. at 15. In addition, in a section entitled

"In The Alternative, Genuine Issues Of Material Fact Regarding The Compatibility Of

The PUD's Proposed Use With The State's Current Public Use Preclude Summary

Judgment," DNR argues that "[t]he trial court should have considered evidence, e.g.,

whether placing a transmission line and roads through the middle of state trust lands along with associated impacts impairs the long term revenue generating capacity of that land." *Id.* at 39, *cited in* Appellants State of Wash. & Peter Goldmark's Suppl. Br. at 15. DNR's challenge deserves more critical attention than the majority gives it.

*C. CNW's Environmental Concerns Have Been Ignored*

More importantly, the majority's analysis gives short shrift to CNW's concerns. CNW argued before the trial court:

> The proposed transmission line would bisect the largest contiguous piece of publically owned shrub-steppe habitat in the Methow Valley and will have multiple adverse environmental impacts on the Methow Valley, including introduction of noxious weeds, fragmentation of wildlife habitat, increased fire risk, and exacerbating erosion, and sedimentation.

CP at 585. CNW continued to point to critical environmental issues related to the PUD's proposed use of the lands before this court. Appellant/Cross-Resp't Conserv. Nw.'s Suppl. Br. at 1. These issues merit more careful consideration than they have received.

I am not without sympathy to PUD's argument that DNR did not adequately raise issues of fact before the trial court regarding how DNR's current use of the lands is incompatible with PUD's proposed use. *See, e.g.*, Suppl. Br. of Resp't PUD at 2, 11.[2] The parties agreed that there were no issues of material fact before the trial

---

[2] Rather than arguing factual issues regarding compatibility, DNR focused its argument on what legal test should apply; essentially, DNR considered that the compatibility standard applied by the trial court and the Court of Appeals, and which is affirmed by the majority, is a new test, whereas PUD argued that the compatibility test dates back more than 100 years and provided

court.[3] TP at 5. However, DNR and CNW did not know how the trial court would resolve the compatibility issue, let alone that the trial court would rely on its own observations in making the decision, and the trial court failed to apply the facts regarding CNW's environmental concerns to its compatibility analysis. CNW and DNR deserve an opportunity to show more clearly how PUD's proposed use is not compatible with DNR's use in light of CNW's concerns.

## D. Remand Is Proper

"The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court." *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002) (citing *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000)). The court considers facts and inferences in a light most favorable to the nonmoving parties, here DNR and CNW. *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 897, 874 P.2d 142 (1994) (citing *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982)). The court may grant summary judgment "if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Lybbert*, 141 Wn.2d at 34 (citing *Ruff v. King County*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)).

---

factual evidence of compatibility. *See* Pet. for Review at 14; PUD's Answer to Pet. for Review at 10.

[3] CNW, in its motion for summary judgment and dismissal pursuant to CR 56, stated that "[t]here are no genuine issues of material fact." CP at 487.

Based on a de novo review, I would remand to the trial court for robust factual finding on the compatibility issue, including consideration of CNW's environmental concerns. I respectfully concur in part and dissent in part.

Gonzalez, J.